## BURGER KING CORPORATION, Plaintiff,

v.

## Robert L. LEE and Sierra Lee, Inc., a California corporation, Defendants.

### No. 90–1956–CIV.

United States District Court,
S.D. Florida.

June 12, 1991.

Joseph H. Serota, Weiss, Serota & Helfman, Miami, Fla., for plaintiff.

Janet L. Humphreys, Karen L. Stetson, Kozyak Tropin Throckmorton & Humphreys, P.A., Miami, Fla., for defendants.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

MARCUS, District Judge.

THIS CAUSE has come before the Court upon Burger King Corporation's ("BKC") Motion for Preliminary Injunction. The action was commenced on August 20, 1990, by BKC for breach of the franchise agreement ("Agreement") based on Defendants' claimed failure to pay for certain royalties, advertising and promotional and training materials. An Amended Complaint was filed on September 11, 1990 which also sought a preliminary and permanent injunction based on claimed violations of the Lanham Act, unfair competition and common law trademark and service mark infringement as well as additional damages.

At the heart of BKC's six-count Amended Complaint is the basic claim that the Defendants, Robert L. Lee ("Lee") and Sierra Lee, Inc. ("Sierra"), breached the Agreement by failing to pay $52,888.11 in royalties, advertising and other expenses. BKC notified Lee and Sierra of the default and when the default was not cured within the time provided for in the Agreement, the franchise was terminated by BKC in September 1990. Lee and Sierra continued to use the BKC trademarks and service marks. BKC now seeks to enjoin Lee and Sierra from using any of the BKC trademarks and service marks or in any manner holding themselves out to be associated, affiliated, sponsored, authorized or connected with BKC. The Defendants, on the other hand, argue that the Agreement was improperly terminated and therefore that the Motion should be denied.

An evidentiary hearing was held on November 28 and 29, 1990, and January 9 and 10, 1991. After reviewing the evidence and the pleadings and for the reasons set forth at some length in our Findings of Fact and Conclusions of Law, we GRANT BKC's Motion for Preliminary Injunction.

## I. FINDINGS OF FACT

1. BKC is a corporation organized under the laws of Florida, with its principal place of business in Dade County, Florida.

2. BKC has developed a restaurant format and operating system and is engaged in the United States and throughout the world in the business of operating Burger King restaurants using the Burger King system and marks. The Burger King System includes a recognized design, decor, color scheme and type of building, uniform standards, specifications and procedures for operation, quality and uniformity of products and services offered, and procedures for inventory management and control.

3. BKC has employed the use of certain trademarks and service marks ("BKC marks") which are registered in the United States Patent and Trademark office. The parties stipulated at the hearing as to the existence of the BKC marks and that BKC continues to use and maintain these marks by advertising and through its franchise system.

4. Pursuant to the Agreement, Lee and Sierra were granted limited license and authority to use and display the BKC marks. BKC has conceded the right of Lee and Sierra to use the BKC marks up to the termination of the franchise. Until the termination of the franchise by BKC on September 11, 1990, Lee and Sierra were the franchisees of BKC Restaurant # 2403 in Bishop, California. Lee and Sierra maintained this BKC franchise at the Bishop location for some twelve years. Lee and Sierra had a second BKC restaurant # 4073 at Mammoth, California.

5. According to paragraph 8A of the Agreement, Lee and Sierra agreed to pay royalties to BKC. Pursuant to paragraph 8B of the Agreement, Lee and Sierra agreed to pay advertising and sales promotion to BKC. Specifically, under the terms of the franchise agreement, Defendants are obligated to pay BKC royalty fees in the amount of 3.5% of monthly gross sales and advertising fees in the amount of 4% of monthly gross sales.

6. At the evidentiary hearing, it remained undisputed that Lee and Sierra had not paid BKC for royalty and advertising on the Bishop store for the period of February 1989 through and including December 1989. At the hearing, Lee admitted that he had not made these payments, but asserted that pursuant to oral agreements with BKC, through a Mr. Donald Wollan, the money was not yet due.

7. Paragraph 16A(2) of the Agreement unequivocally provides that a franchisee's failure to pay royalties and advertising when due as required by the Agreement shall constitute an act of "default." The Agreement also says that the franchisee shall have ten (10) days after notification of the default to cure the delinquency.

8. On August 20, 1990, BKC sent a letter to Lee by certified mail informing him that he and Sierra were in default to BKC in the amount of $52,888.11, which included past due royalty and advertising fees. The default notice also notified Lee and Sierra that unless full payment of all monetary obligations was made within ten days of receipt of the notice, the Agreement would automatically terminate. Lee acknowledged receipt of the notice of default as well as the letters confirming the termination of the franchise sent on September 11, 1990.

9. In his defense, Lee testified at the hearing that sometime in the Spring of 1989 he had a conversation with Donald Wollan, a representative of BKC, regarding the financial situation of his two restaurants. Lee said that Mr. Wollan told him that Lee need not pay any advertising or royalties on Restaurant # 2403 in Bishop, California or Lee's other restaurant [which has since been sold and terminated with the consent of BKC prior to the institution of this lawsuit] until sufficient funds were generated by the restaurants to permit Lee to restructure his finances and do a "Lite and Brite" renovation or remodeling on the Bishop store to make it more competitive. Lee testified that his agreement with Mr. Wollan provided for an "indefinite" postponement of all royalties and advertising payments and that no further terms were discussed or agreed to.

10. Mr. Wollan testified by way of deposition, however, that he did not recall whether or not such an agreement was made but that this was a "serious matter" and would typically be confirmed in writing. He did say that he recalled meeting with Lee to discuss Lee's financial condition. He stated that the fact that no such agreement was ever executed would suggest to him that there was no agreement.

11. It became clear at the hearing that a crucial piece of evidence with regard to this issue was a May 16, 1989 memorandum ("May Memo"), signed by both Lee and BKC representatives, which attempted to set forth the terms for the temporary postponement of payments. Lee had previ-

**1152**

ously been sent the May Memo by Dennis Mullen of BKC with a cover letter dated May 23, 1989. Lee testified that he had a meeting with Larry Ralston, a representative of BKC, on May 31, 1989, where he discussed the May Memo and then signed it. The May Memo stated in pertinent part:

> The Region has asked to *postpone payment of royalty and advertising for a six (6) month period (February 1989 to July 1989), at which time a repayment plan will be set up, based on the franchisee's current financial position,* or we should get repayment if the stores are sold. The franchisee is to remain off the No Ship/No Spend status, as this would only hinder his ability further. At this time, the receivables balance should be fully reserved until a final resolution is reached.

(emphasis added). Lee first testified that Ralston had not talked with Lee regarding Lee's obligation to begin paying royalties and advertising on August 1, 1989. Later, Lee said that, notwithstanding the language in the Memo, Ralston allegedly told Lee that Lee did not have to pay any royalties or advertising until the "Lite and Brite" renovation was done. Finally, however, Lee admitted that Mr. Ralston did *not* tell him that there was no obligation to pay BKC anything until Lee had performed the "Lite and Brite" renovation.

12. There is no mention in the May Memo and Lee could provide no further clarification with regard to essential terms of that portion of the May Memo which related to the repayment schedule to be established after the six-month postponement of royalties and advertising ended. The May Memo contains no mention of such terms as the length of time to repay, the obligation to pay interest or what amount of interest to pay, whether or not the debt was to be secured, whether the payments should be amortized, whether a balloon payment would be used, how Lee's "current financial position" would be resolved, or whether his personal assets and finances were part of the formula for the "current financial position." While the May Memo provides for a six-month postponement of royalty and advertising, from

February 1989 to July 1989, it remains undisputed at the hearing that Lee did not begin paying royalty and advertising as they became due from either restaurant from August through December 1989.

13. In July 1989, BKC representative, Chris Slaughter, called Lee to discuss Lee's financial situation and the fact that the six-month postponement ended on August 1, 1989. We specifically credit Slaughter's testimony. Among other things, he testified that at no time during his conversation with Lee did Lee advise him that Lee had an agreement with BKC or Mr. Wollan to the effect that Lee had no obligation to make any payments to BKC until the "Lite and Brite" renovation could be done. Mr. Slaughter testified that he spoke with Lee on three separate occasions during the months of July and August, 1989 in order to discuss repayment conditions. Slaughter said that Lee never mentioned anything about a "Lite and Brite" renovation. Rather, Slaughter testified, Lee simply asked and demanded that BKC "write off" the debt. In addition, another BKC accountant, Mr. Carrick, testified that he had spoken to Lee on a number of occasions regarding repayment and Lee never told him anything about the renovation.

Carrick specifically testified that in or about June 1989 he called Lee as Lee owed a significant amount to BKC. Lee told Carrick that he had an agreement with BKC to "postpone" payments from February to July 1989. No reference was made by Lee to a "Lite and Brite" renovation. Carrick had subsequent conversations with Lee, but notably, Lee never said that he did not have to make any repayments until a renovation was completed nor did Lee ever offer to make any repayments between February and August 1990. He simply told Carrick that he could not then afford to make any repayments. While Lee testified, contrary to Carrick's account, that Carrick had never called Lee regarding repayment, we specifically credit Carrick's testimony.

14. Pursuant to the terms of the May Memo, in July and August 1989, BKC accountants, Messrs. Carrick and Slaughter,

performed analyses of the "financial condition" of Lee's franchises including a review of the expenses. After analyzing Lee's financial statements, including many expenses which BKC believed could be eliminated or reduced, a repayment schedule and promissory note ("Note") based on that schedule were prepared by BKC attorney, Elliot Tunis. The accountants testified at the hearings as to how they calculated their conclusions in preparation of the Note, and we find that the methodologies employed fully comport with accepted principles of accounting. The Note and repayment schedule were sent to Lee on September 8, 1989 by Mr. Tunis. According to Messrs. Carrick and Slaughter, the three-year payout with a balloon at the end of three years was as generous a repayment schedule as any franchise in the region was being offered at that time. Mr. Carrick stated, in fact, that the Note was the most favorable one he had ever done.

15. Lee refused to sign the Note, claiming that he could not afford such payments. The Note proposed monthly payments of $1,330.71 beginning October 1, 1989.

16. In response to a request for a statement or proforma, Lee and his accountant prepared a cash flow projection ("Projection") which was transmitted to BKC in early 1990. Included in the Projection was an entry providing for a BKC payback of $2,000.00 per month beginning in December 1989 and continuing through November 30, 1990. The Projection, however, contains no reference as to how the postponed royalties and advertising would be paid beyond November 30, 1990. Lee admitted that he did *not* advise BKC orally or in writing that the Projection was intended to be an "offer" of repayment of the postponed royalties and advertising. Both of BKC accountants who testified at the hearings, and who we have found to be credible, stated that they did not read the Projection as an offer to repay, and that in any event, their Note requested monthly payments *less* than what Lee's Projection illustrated. Mr. Slaughter specifically testified that he did not read Lee's Projection as an offer be-

cause it did not contain any interest rate figures, nor the length of the payback term, nor finally, whether or not there would be a balloon payment. Furthermore, the BKC accountants spoke with Lee after the Projection was transmitted. Lee never referred to the document as an offer for repayment. Mr. Carrick testified that when he called Lee asking for Lee's repayment, after receiving Lee's Projection, Lee never stated that he had already sent it. Lee did not deny this.

17. BKC spoke to Lee on a monthly basis requesting payment of the $52,888.11 or, in the alternative, a submission of a repayment schedule acceptable to BKC. Other than the Projection which we find is not and was not intended to be an offer of repayment of the amount due, there is no other evidence that Lee ever submitted a repayment plan to BKC for the postponed royalties and advertising payments.

18. On June 25, 1990, Lee wrote a letter to Mr. Mullen asking to "credit" the postponed royalties advertising [i.e., "write-off"] against further obligations. In this letter, Lee also requested that the $43,000 he paid to BKC in December 1989 when his other retaurant was closed should be returned to Lee. The letter, notably, contains no offer to repay the $52,888.11 owed.

19. On August 23, 1990, Lee met with various representatives of BKC at BKC offices. At this meeting, Lee made no offer to repay the postponed royalties and advertising. At that time, a copy of the notice of default which had already been sent to his home was hand-delivered to him.

20. Between the time Lee received the notice of default and the ten-day period set forth in the letter for the purpose of curing the default, Lee made no payment to BKC.

21. Subsequent to termination, Lee and Sierra continued to use the BKC name and BKC marks and to otherwise represent to the public that the restaurant was an authorized BKC franchise.

22. Since termination, BKC conducted no formal reviews or evaluations of the restaurant and offered no operational assistance. Other than certain franchise

mailings received by Lee, BKC effectively ceased communication with Lee after termination.

23. Subsequent to the termination of the franchise, BKC permitted its distributors to continue to provide food products to Lee. Mr. Tunis testified that this was done to protect the public and to prevent Lee and Sierra from selling non-BKC food products while still appearing to the public to be a BKC authorized franchise. Lee testified that he understood BKC's position to be that the franchise was terminated and he understood that BKC had filed the amended complaint and request for preliminary injunctive relief in order to prohibit him from continuing to use the BKC name and BKC marks. There was no evidence presented suggesting that Lee was "misled" as to whether BKC considered his franchise terminated subsequent to the September letters of termination.

## II. CONCLUSIONS OF LAW

### A. *Prerequisites for Injunctive Relief*

■ It is undisputed that under federal law in this Circuit Plaintiffs must prove four elements to obtain a preliminary injunction. Pursuant to Fed.R.Civ.P. 65, a district court is reposed with discretionary power to grant preliminary injunctive relief. *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir.1983); *Deerfield Medical Center v. Deerfield Beach*, 661 F.2d 328, 332 (5th Cir.1981). In exercising its discretion, however, the court must evaluate and balance four recognized prerequisites to preliminary injunctive relief: (1) a substantial likelihood that the movant will prevail on the underlying merits of the case; (2) a substantial threat that the moving party will suffer irreparable damage if relief is denied; (3) a finding that the threatened injury to the movant outweighs the harm the injunction may cause defendant; and (4) a finding that the entry of a preliminary injunction would not disserve the public interest. *Tally–Ho, Inc. v. Coast Community College District*, 889 F.2d 1018, 1022 (11th Cir.1989). It is also well established in this Circuit that Plaintiffs bear the burden of persuasion on *all* four preliminary

injunctive standards. *United States v. Jefferson County*, 720 F.2d 1511 (11th Cir. 1983).

Moreover, in exercising its discretion, a court is guided by established rules and principles of equity jurisprudence. *Muss v. Miami Beach*, 312 So.2d 553, 554 (Fla. 3d DCA), *cert. denied*, 321 So.2d 553 (Fla. 1975). And we are reminded that "a preliminary injunction is an extraordinary and drastic remedy"; it is the exception and not the rule. *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 573 (5th Cir.1974).

Plaintiff has established all four prerequisites and is in our judgment entitled to the entry of a preliminary injunction.

### B. *Substantial Likelihood of Success*

To begin, BKC asserts that it has properly terminated Lee's franchise, and therefore, Lee is violating trademark laws by holding himself out to be associated, affiliated, sponsored, authorized, or connected with BKC. We agree and find that BKC has likely proven that it properly terminated Lee's franchise in accordance with the Agreement. It is undisputed that in an effort to assist Lee, BKC agreed to postpone payment of royalty and advertising for a six-month period between February 1989 and July 1989. At the end of July 1989, a repayment plan was to be set up or repayment was to be made in full if the restaurants were sold.

After the expiration of the abatement period, a repayment plan was set up after consideration of the restaurant's financial situation. In fact, the repayment schedule, spread over three years, was far more generous than BKC repayment proposals offered to other franchisees. A promissory note confirming this repayment plan was sent to Lee, but Lee refused to sign the Note. During the course of the next eight months, BKC attempted to get Lee to pay the outstanding funds or propose an acceptable repayment plan. At no time did Lee take either action. On August 20, 1990, a notice of default was sent to Lee pursuant to the franchise agreement stating that the failure to pay royalty and advertising charges totalling $52,888.11

had caused Defendants to be in default under the franchise agreement. The letter also stated that unless payment of this monetary obligation was received by BKC within ten days after receipt of this letter, the franchise agreement would terminate pursuant to its terms, and that BKC would pursue any and all remedies available to it. Payment was not received by BKC relating to the default and, as a result, on September 5 and 11, 1990, letters were sent pursuant to the franchise agreement terminating the franchise due to the uncured default. In light of this factual scenario portrayed at the evidentiary hearing, we believe that BKC has likely proven that it properly terminated Lee's franchise.

In opposition to BKC's Motion, Lee relies mainly on three arguments and claims. Because these claims are in the form of affirmative defenses, Lee has the burden to prove the existence and merits of these claims by a preponderance of the evidence. *Boymer v. Birmelin*, 227 So.2d 358 (Fla. 3d DCA 1969). First, Lee argues that he was not bound to pay his franchisee fees due to an enforceable oral agreement with Mr. Wollan. Lee claims that Wollan told him that Lee need not pay any advertising fees or royalties until sufficient funds were generated by the restaurants to permit Lee to do a "Lite and Brite" renovation. On the record presented we do not believe that Lee and Wollan entered into the claimed agreement.[1] While Lee claimed to have been told by Wollan that he need not pay advertising or royalties payments until Lee was financially able to renovate his franchise, we do not believe such a promise was ever made by BKC. Wollan did not recall whether any such agreement had been made, but observed that such an agreement was a "serious matter" and would typically be made in writing. Moreover, the terms of this claimed oral agreement are indefinite as to essential terms. Also, the purported oral agreement differs materially from the written May Memorandum. Notably, Lee never made any mention

about a "Lite and Brite" renovation in conversations with Messrs. Slaughter and Carrick. In fact, the testimony illustrated that Lee did not mention this alleged promise until the time that BKC found him in default. Simply put, we cannot find on this record any oral agreement; nor would such an agreement be enforceable.

Second, Lee claims that he was not obligated to pay the fees because BKC breached the terms of the May Memorandum by failing to provide Lee with a note and repayment schedule which he could afford. BKC initially argues that as to the preparation of a repayment schedule, the May Memorandum is too indefinite as to essential terms to be enforceable. *Balter v. Pan American Bank*, 383 So.2d 256 (Fla. 3d DCA 1980). Although we are not required to answer this question today, since we find that BKC fully complied with the terms of the May Memorandum, the written agreement is indefinite in many important ways. Lee himself described the "repayment" portion of the Memorandum as an "agreement to agree later." In *Balter v. Pan American Bank*, 383 So.2d 256 (Fla. 3d DCA 1980), the Third District of Appeal found an alleged oral loan commitment to be unenforceable where there was no understanding as to (a) the exact amount of the loan, (b) the interest rate, and (c) the time and method of repayment. *Id.* at 257. All such terms are lacking in the May Memo as well. In *Smith v. Smith*, 375 So.2d 1138 (Fla. 3d DCA 1979), the court held that an agreement between a husband and wife for the transfer of a one-half interest in a marital home was too indefinite to be enforced where the duration of the agreement was not specified. *Smith*, 375 So.2d at 1140. Here, the Memorandum is silent as to the total amount of outstanding indebtedness, and there is no mention of the amount of interest to be charged or the time and method of repayment. Moreover, there is also no indication as to whether the debt is secured or unsecured.

---

1. The Fifth Circuit held in *Tipton v. Woodbury*, 616 F.2d 170, 176 (5th Cir.1980) that an oral contract must be proved by more than a preponderance; the test is "clear, full and free from suspicion." It is not necessary to determine which standard applies since this court finds that Lee has failed to prove the existence of the agreement by either standard.

More importantly, however, we are not persuaded by Lee's claim that BKC breached the May Memo. The May Memo involved a six-month postponement of royalties and advertising, after which time Lee was to begin making royalty and advertising payments. Lee's admitted failure to make such payments for the following five months constitutes a clear breach of the Agreement and a breach of the May Memo. *Babe, Inc. v. Baby's Formula Service, Inc.*, 165 So.2d 795 (Fla. 3d DCA 1964). Mr. Carrick and Mr. Slaughter credibly testified in detail as to how they assessed Lee's financial position using generally accepted accounting principles. They stated how they took care in assessing Lee's financial position taking into consideration Lee's Profits & Losses ("P & L") and proposing ways that Lee could run a more efficient business. In accordance with their findings, the BKC accountants prepared a Note and proposed that Lee pay $1,330.71 a month. More important, Lee's *own* Projection provides for a payment of $2,000.00 a month beginning in December 1989. In short, we do not believe that BKC's proposal that Lee pay $1,330.71 a month would be a "breach" of the May Memo, even if enforceable, especially when Lee's own projection shows that he could make a payment beginning in December 1989 of $2,000.00 per month. Furthermore, Lee never offered or started to pay anything despite his present assertion that he intended to pay $2,000.00 a month commencing in December 1989.

As his third and final defense, Lee seems to argue alternatively that he was fraudently induced into entering into the May Memorandum. However, we can find no evidence of fraudulent inducement, duress or undue influence which would prohibit BKC from enforcing the Agreement or terminating the franchise based on the nonpayment of royalties and advertising. This claim is without merit.

■ On an additional note, BKC's decision to permit its distributors to provide Lee with BKC food products is not a waiver of its termination of the franchise agreement. *See Burger King Corp. v. Moore and Zindel*, No. 89–1023 (S.D.Fla. August 14, 1989). In that case, Judge Aronovitz granted Burger King's Motion for a preliminary injunction even though Burger King had continued to sell the terminated franchisee approved products.

The defendants' contention fails to appreciate the fact that it is the defendants' very conduct which places Burger King in a position of choosing between two evils. That is, if after proper termination the defendants refuse to cease utilizing the Burger King Corporation trademarks and continue doing business as a Burger King restaurant, Burger King, as a matter of policy, must choose between continuing to sell a terminated franchisee approved Burger King materials and supplies to ensure the quality of the food products or must cease selling approved Burger King products to a terminated franchisee knowing that they will secure food products from some other source and sell them as Burger King products. Viewed in this light, Burger King corporation's policy-choice of continuing to sell their approved products to insure quality to the consuming public is a reasonable and valid decision under the circumstances created by the defendants and *should not intrude upon the plaintiff's right or entitlement to a preliminary injunction.*

*Moore* at pp. 12–13. Lee and Sierra failed to present any convincing evidence that statements or conduct of BKC misled Lee and Sierra or caused them to believe that the franchise was not terminated. In any event, paragraph 18B of the Agreement states that the failure of BKC to exercise any right or option it has under the Agreement shall not constitute a waiver of its right to require exact and strict compliance with the terms of the Agreement. This non-waiver provision is enforceable under the circumstances. *Philpot v. Bouchelle*, 411 So.2d 1341 (Fla. 1st DCA 1982). *See also Burger King Corp. v. Coogan*, No. 89–1644 (S.D.Fla. November 23, 1988).

In sum, Lee and Sierra did not pay for royalties and advertising as required by the Agreement. Lee and Sierra have not likely proven a binding, definite oral agreement

with Wollan to postpone the debt for an indefinite time, or that BKC breached the terms of the May Memorandum. BKC has also established a likelihood of success on the merits with regard to its claims for violation of the Lanham Act, unfair competition and violation of common law trademark and service mark infringement.

### C. *Irreparable Harm*

The existence of a likelihood of confusion constitutes irreparable injury as a matter of law sufficient to satisfy the requirements of Fed.R.Civ.P. 65. *Sundor Brands, Inc. v. Borden, Inc.*, 653 F.Supp. 86, 93 (M.D.Fla.1986), *citing E. Remy Martin and Co.*, 756 F.2d 1525, 1530 n. 14. Moreover, where there is a likelihood of confusion, remedies under the Lanham Act, including injunctive relief, are appropriate. *Conagra, Inc. v. Singleton*, 743 F.2d 1508, 1512 (11th Cir.1984). Because we have found that BKC is likely to prevail on the merits of its trademark infringement claim by establishing a likelihood of confusion, it follows that BKC has established that the injury it faces is of an irreparable nature. This is true even though a plaintiff is not required to separately show irreparable injury in order to obtain a preliminary injunction if a prima facie case of an infringement is made. *Universal City Studios, Inc. v. Casey & Casey, Inc.*, 622 F.Supp. 201 (S.D.Fla.1985). BKC has satisfied this prong for the issuance of a preliminary injunction.

### D. *Balance of Injury*

It merits observing that both parties to this conflict stand in a position in which they have much to lose. Lee and Sierra, if the preliminary injunction is granted, will lose their business and a substantial investment. BKC, if the preliminary injunction is denied, will be put in a position where a terminated franchisee will remain in operation unregulated and uninspected by the franchisor until the lawsuit has been concluded many months in the future. BKC would have no effective way to monitor or control the quality or safety of the franchise being operated by Lee and Sierra.

Additionally, if BKC cannot enjoin a terminated franchisee from using its name and trademarks, its name and trademarks would lose significant value. BKC would also be deprived of its ability to exercise control over the nature and quality of its products and restaurant service, potentially harming the goodwill and hard earned reputation of BKC, until the lawsuit is ultimately concluded. *See Burger King Corp. v. Austin, et al.*, No. 90–784 (S.D.Fla. December 21, 1990). In short, while the balance of harms cuts both ways in this case, we think BKC has sustained its burden on this point too.

We are not persuaded by Lee's argument that an injunction should not issue, even if the franchise was properly terminated, because of the harm it would do to Defendants' business. Simply put, a terminated franchisee has no right to continue to hold itself out as an authorized franchisee and enjoy its benefits. We reach today's decision only after being satisfied that the evidence strongly and substantially illustrates that BKC properly terminated Lee's franchise. A court will always be presented with a similar equitable argument from a terminated franchisee when it is faced with a confrontation between a franchisor corporation and a family-run franchise. Defendant's argument really amounts to the sweeping claim that no franchisee could ever be enjoined preliminarily even in the face of a clear showing of breach and harm to the franchisor. The consequence of that argument would be that franchisors would lose their right to oversee and exercise control of their franchises. We are not persuaded by this argument in the context of this case.

### E. *Public Interest*

Finally, we observe that it will not disserve the public interest to grant this preliminary injunction. It is not in the public interest to condone Lee and Sierra's material breach of the Agreement or to allow Lee and Sierra to continue to operate the franchise with the unauthorized use of BKC marks for an extended period of time. As stated in *Church of Scientology Int'l v.*

*Elmira Mission of Church of Scientology,* 794 F.2d 38, 44 (2d Cir.1986):

> ... the public interest is especially served by issuing a preliminary injunction against a former licensee as the licensee's status increases the probability of consumer confusion.

It is difficult to understand how the public interest under these circumstances could be served by denying the preliminary injunction. Consequently, we find that BKC has satisfied the fourth and final element for the issuance of a preliminary injunction.

In light of the foregoing discussion and in view of the standard which must be met in order to be entitled to a preliminary injunction, we find that BKC has adequately met all the essential elements. Accordingly,

It is ORDERED AND ADJUDGED that BKC's motion for preliminary injunction is GRANTED and Lee and Sierra are preliminarily enjoined from using the BKC name, BKC marks, logo or in any manner, directly or indirectly, representing to the public that they are affiliated, licensed, sponsored, authorized or approved by BKC.

The parties are also ORDERED to submit briefs within 10 days of this Order, stating their position as to the appropriate amount of bond that BKC shall post for the payment of costs and damage as may be incurred or suffered by Lee and Sierra if they are found to have been wrongfully enjoined.

DONE AND ORDERED.