BURGER KING CORPORATION,
Plaintiff,

v.

Idrees S. AGAD and Mohammad Iqbal
Balagamwala, Defendants.

No. 95–007–CIV.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 29, 1995.

Howard Wolfson, Norman Leon, Whitman, Breed, Abbott & Morgan, New York City, Francisco R. Angones, Angones, Hunter, McClure, Lynch & Williams, P.A., Miami, FL, for plaintiff.

Robert Zarco, Zarco & Associates, Miami, FL, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KEHOE, Senior District Judge.

This matter came before the Court upon the request of Plaintiff Burger King Corporation (hereinafter "BKC") for a permanent injunction enjoining the unauthorized operation of Burger King Restaurant No. 171 and use of BKC's registered trademarks and attendant service marks by Defendants Idrees S. Agad and Mohammad Iqbal Balagamwala. Having considered the file generally, the memoranda submitted by the parties and the evidence introduced at the preliminary and final permanent injunction hearings held in this matter the Court hereupon *ENTERS* the following findings of fact and conclusions.

### FINDINGS OF FACT

#### A.

#### The Parties

1. BKC is incorporated under the laws of the State of Florida and maintains its principal place of business in Miami, Florida, and is engaged in the business of operating a national and world-wide system of company-owned and franchised "Burger King" restaurants.

2. Defendants Idrees S. Agad and Mohammad Iqbal Balagamwala are citizens and residents of the state of Georgia.

3. BKC and the Defendants are parties to certain agreements discussed below.

#### B.

#### The BKC Marks

4. To identify the source, origin and sponsorship of "Burger King" restaurants, products and services, BKC employs and causes to be advertised throughout the United States various trademarks and service marks, collectively referred to herein as the "BKC Marks."[1] (The registrations of the

---

1. The following BKC Marks are registered in the United States Patent and Trademark Office:

| Trademark or Service Mark | Reg. No. | Issue Date |
|---|---|---|
| HOME OF THE WHOPPER (renewed through 2005) | 782,990 | Jan. 5, 1965 |

BKC Marks are currently in full force and effect.)

5. Eleven of the twelve BKC Marks were registered over five years ago and, therefore, are now incontestable pursuant to Title 15, United States Code, Section 1065.

6. BKC and its franchisees have spent considerable sums of money advertising and promoting BKC's restaurants, services and products.[2] As a result of the expenditures and efforts by BKC and its franchisees, valuable "good will" has been developed for the BKC Marks and for the restaurants, products and services which bear the Marks and thus identify BKC as their sponsor or source.

### C.

*The Defendants' Franchise and Lease/Sublease Agreements With BKC For Restaurant 171 Have Expired By Their Own Terms*

7. The Defendants were the franchisees of Burger King Restaurant No. 171, which is located at 2425 Peachtree Road, N.E., Atlanta, Georgia ("Restaurant 171"). On May 17, 1979, they entered into a Franchise Agreement with BKC for that restaurant. Paragraph 1 of the Addendum to the Franchise Agreement provides that the Agreement "shall expire on December 30, 1994, ... [and that the Defendants] accept this license with the full and complete understanding that the license expires on December 30, 1994, with no promise or assurance of renewal or the granting of a new license at expiration."

Thus, by its own terms, the Franchise Agreement for Restaurant 171, and the Defendants' limited license to use BKC's Marks in connection with the operation of that restaurant, expired on December 30, 1994.

8. BKC also subleases to the Defendants the property underlying Restaurant 171, pursuant to a Sublease Agreement dated May 17, 1979, Paragraph 2.1 of which provides that the Sublease "shall commence on May 18, 1979 ... and shall expire on December 30, 1994...." There is no provision for renewal in the Sublease.

9. The Defendants' Franchise and Sublease Agreements for Restaurant 171 expired by their own terms on December 30, 1994.

10. Section 16.B. of Defendants' Franchise Agreement specifically provides that:

(1) Upon termination *or expiration of this Agreement,* FRANCHISEE's right to use the Burger King Marks and the Burger King System shall terminate. FRANCHISEE shall not thereafter identify himself as a Burger King franchisee or publicly identify himself as a former Burger King franchisee or use any of BKC's trade secrets, operating procedures, promotional materials, Marks or any mark confusingly similar.

\*    \*    \*    \*    \*    \*

(3) If the parties do not enter into a successor Franchise Agreement, FRANCHISEE agrees to immediately upon termination *or expiration* of this Agreement,

| | | |
|---|---|---|
| BURGER KING (renewed through 2009) | 869,775 | May 20, 1969 |
| WHOPPER (renewed through 2000) | 899,775 | Sept. 29, 1970 |
| BURGER KING (Design) (renewed through 2000) | 901,311 | Oct. 20, 1970 |
| BURGER KING (Design) (renewed through 2003) | 961,014 | June 12, 1973 |
| BURGER KING (Design) (lined for the colors red and orange) | 1,057,250 | Jan. 25, 1977 |
| BURGER KING (Stylized) | 1,076,177 | Oct. 25, 1977 |
| BURGER KING (with logo) | 1,146,721 | Feb. 3, 1981 |
| A.M. EXPRESS | 1,451,533 | Aug. 4, 1987 |
| CROISSAN'WICH | 1,550,398 | Aug. 1, 1989 |
| CHICKEN TENDERS | 1,785,694 | Aug. 3, 1993 |
| WHOPPER JR. | 1,062,368 | Mar. 29, 1977 |

**2.** In its last fiscal year alone, BKC spent in excess of $200 million dollars advertising the products and services sold under the various BKC Marks.

make such removals or changes in signs and the building as BKC shall request, so as to effectively distinguish the premises from its former appearance and from any other Burger King Restaurant. . . .

11. Similarly, Section 8.3 of their Lease/Sublease Agreement provides that:

In the event of cancellation *or termination of this Lease* either by operation of law or otherwise, or in the event Lessor gives notice to Lessee to vacate the premises pursuant to a default of this Lease, Lessee agrees to immediately peacefully surrender the premises to Lessor . . . [emphasis added]

12. In accordance with the expiration dates of the Franchise and Sublease Agreements, on December 30, 1994, BKC demanded in writing that the Defendants cease operating Restaurant 171 at the close of business that day and vacate the premises pursuant to the terms of their Agreements with BKC.

13 Notwithstanding the expiration of their Agreements and BKC's demand, subsequent to December 30, 1994, the Defendants have continued to occupy Restaurant 171 and to hold themselves out to the public as operating a genuine and authorized "Burger King" restaurant.

14. The Defendants' continued possession and operation of Restaurant 171 is not authorized by BKC.

15. By virtue of the expiration of the Defendants' Franchise and Sublease Agreements, BKC is unable to control the nature and quality of the goods and services that the Defendants provide at Restaurant 171.

16. The Defendants' continued operation of Restaurant 171 will mislead consumers into believing that the products sold at the restaurant are authorized and endorsed by BKC, prepared in the manner prescribed by BKC and subject to BKC's supervision.

17. As long as the Defendants continue to operate Restaurant 171, consumers have no practical way of knowing that BKC's relationship with the Defendants at that restaurant has expired. As a result, any consumer dissatisfaction with Restaurant 171 or with the products or services provided therein will be attributed to BKC and to the entire Burger King System. Thus, the potential damage to the goodwill associated with the BKC Marks and to BKC's reputation is significant, possibly incalculable.

18. Accordingly, because of the above-described facts and circumstances, BKC commenced this action in January 1995, and promptly moved for injunctive relief, seeking to enjoin the Defendants' continued operation of Restaurant 171 and infringement of its BKC Marks. Hearings were thereupon held on BKC's Motion for a Preliminary Injunction, resulting in the denial of the motion, and a hearing held shortly thereafter on BKC's request for a permanent injunction.

## CONCLUSIONS OF LAW

### A.

#### Jurisdiction and Venue

1. This Court has subject matter jurisdiction over this action pursuant to Section 39 of the Lanham Act, Title 15, United States Code, Section 1121, and Title 28, United States Codes, Sections 1331, 1332(a)(1), 1337 and 1338(a).

2. Venue is proper in this Court pursuant to Title 28, United States Code, Section 1391(a) and (b), and the terms of the agreements entered into by and between the parties.

### B.

#### The Defendants' Unauthorized Use of the BKC Marks After the Expiration of their Franchise Violates the Lanham Trademark Act

3. BKC's statutory claims against the Defendants arise under two principal provisions of the Lanham Act (Title 15, United States Code, Section 1051 *et seq.*). The first is Section 32(1) of the Lanham Act, which proscribes the "use in commerce . . . of a registered mark . . . which use is likely to cause confusion, or to cause mistake", and is "without the consent of the registrant." Title 15, United States Code, Section 1114(1)(a). The second is Section 43(a), which prohibits, *inter alia*, "false designation of origin, . . . or any false or misleading

description of fact, or false or misleading representation" as to the source of business establishments, services or goods. Title 15, United States Code, Section 1125(a). Under either section, the Lanham Act "creates a claim for trademark infringement when a trademark holder can demonstrate that the use of its trademark by another is likely to confuse consumers as to the source of the product." *Home Box Office, Inc. v. Showtime/The Movie Channel, Inc.*, 832 F.2d 1311, 1314 (2d Cir.1987). "[T]he critical question ... is whether there is a likelihood of confusion, mistake, or deception between the registered mark and the allegedly infringing mark." *John H. Harland Company v. Clarke Checks, Inc.*, 711 F.2d 966, 972 (11th Cir.1983); *Sun–Fun Products, Inc. v. Suntan Research & Development, Inc.*, 656 F.2d 186, 189 (5th Cir.1981).

4. To establish its claim for trademark infringement and, accordingly, its entitlement to permanent injunctive relief, BKC must prove the following:

(1) That the BKC Marks are valid and subsisting;

(2) That the Defendants' license to use the BKC Marks has expired;

(3) That the Defendants' continue to use the BKC Marks without BKC's consent; and

(4) That the Defendants' actions are likely to mislead consumers as to the source, sponsorship or origin of the restaurant's goods and services.

*See,* e.g., the factors set forth in *Dieter v. B & H Industries of Southwest Florida, Inc.*, 880 F.2d 322, 326 (11th Cir.1989), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990); *Conagra, Inc. v. Singleton,* 743 F.2d 1508, 1512 (11th Cir.1984); *Burger King Corporation v. Mason,* 710 F.2d 1480, 1491–92 (11th Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1599, 80 L.Ed.2d 130 (1984). The Court finds that each of these four elements is satisfied in the present case.

*Incontestable Status of BKC's Marks*

5. BKC's registration of the BKC Marks with the United States Patent and Trademark Office and its subsequent filing of affidavits of use when required to maintain these registrations demonstrate BKC's continuing, exclusive right to use the BKC Marks in connection with the goods and services specified in the registrations. Indeed, all of the principal BKC Marks have now achieved "incontestable" status pursuant to Title 15, United States Code, Section 1065, and are, therefore, presumptively valid and subsisting. *See Burger King Corporation v. Majeed,* 805 F.Supp. 994, 1002 (S.D.Fla.1992) (quoting *Burger King Corporation v. Hall,* 770 F.Supp. 633, 637 (S.D.Fla.1991)).

*The Expiration of the Defendants' License to Use the BKC Marks and Their Subsequent Unauthorized Use of the BKC Marks*

6. The Defendants' Franchise and Sublease Agreements both unambiguously provide that they expire, by their own terms, on December 30, 1994. To that end, both Defendants have filed Declarations in opposition to BKC's pending Motion for Summary Judgment in *Hall, et al., v. Burger King Corp.,* 89–0260–Civ–Kehoe, a related action, in which they acknowledged that their Franchise Agreement for Restaurant No. 171 "expire[d] on December 30, 1994."

7. It is hornbook law that "[o]nce a license contract is terminated, there is no doubt that the ex-licensee has no authorization or consent to continue use of the mark. After the license has ended, the ex-licensee must stop use of the mark." 3 *McCarthy on Trademarks and Unfair Competition,* § 25.07[1] at 25–47 (3d ed.). As the Third Circuit stated in *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 143 (3d Cir.1981), "[o]nce a license has expired, use of the formerly licensed trademark constitutes infringement." *See also Frisch's Restaurant, Inc. v. Elby's Big Boy of Steubenville, Inc.,* 661 F.Supp. 971 (S.D.Ohio 1987) (a licensee's use of licensed mark after the expiration of the license constitutes trademark infringement), *aff'd,* 849 F.2d 1012 (6th Cir. 1988); and 3 *Altman on Callman, Unfair Competition, Trademarks and Monopolies,* § 19.53 at 432–437 (4th ed.). In stated by the former Fifth Circuit Court of Appeals, in *Professional Golfers Association of America*

*v. Bankers Life & Casualty Company*, 514 F.2d 665, 670 (5th Cir.1975):

> A former licensee cannot mislead the public into believing that its affiliation continued once the licensing arrangements has ceased. [citation omitted.] *For once the contract ends, a licensee's right to the mark ends, and any subsequent use constitutes infringement.* [emphasis added]

### The Defendants' Unauthorized Use of the BKC Marks is Likely to Mislead Consumers

8. In this Circuit, "it is well established that 'falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or *sponsorship* constitutes infringement.'" *Burger King Corporation v. Mason*, 710 F.2d at 1492. "Continued use by an ex-licensee of the licensor's mark constitutes a fraud on the public, since they are led to think that the ex-licensee is still connected with the licensor." [3] 3 *McCarthy on Trademarks and Unfair Competition*, § 25.07[1] at 25–47 (3d ed.).

9. That such confusion will occur here is clear. As this Court held in *Burger King Corporation v. Hall*, 770 F.Supp. 633, 638 (S.D.Fla.1991), "[c]onsumers could not possibly know that [the Defendants'] restaurant, which for all purposes appears to be a genuine Burger King restaurant, is no longer affiliated with BKC." *See also Burger King Corporation v. Majeed*, 805 F.Supp. 994, 1003 (S.D.Fla.1992). In words equally dispositive here, the Eleventh Circuit has previously observed that:

Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks. A patron of a restaurant adorned with the Burger King trademarks undoubtedly would believe that BKC endorses the operation of the restaurant. Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated. Any shortcomings of the franchise therefore will be attributed to BKC.

*Burger King Corporation v. Mason*, 710 F.2d at 1492–93.[4] Indeed, the "... likelihood of confusion is an inevitable result of the concurrent use of the ..." subject trademark. *Opticians Association of America v. Independent Opticians of America*, 920 F.2d 187, 195 (3d Cir.1990).

### C.

### The Defendants Have Not Raised Any Valid Defense to BKC's Infringement Claim

10. As this Court held in *Burger King Corporation v. Hall*, 770 F.Supp. at 639, and *Burger King Corporation v. Majeed*, 805 F.Supp. at 1005, due to the incontestable status of BKC's Marks, the Defendants are strictly limited to eight statutory defenses. *See also* Title 15, United States Code, Section 1115(b); and *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Company*, 631 F.Supp. 735, 740 (S.D.N.Y.1985) (incontestability of trademarks under § 1065 bars any defense other than those set forth by

---

3. The seven factors analyzed to determine whether the Defendants' use of BKC's Marks is likely to cause confusion are satisfied in this case: (1) BKC's Marks are registered, incontestable and subject to a statutory presumption of validity; (2) the Marks in question are identical since the Defendants continue to use the BKC Marks; (3) the Marks identify identical products and services since the Defendants continue to operate Restaurant 171 as if it were an authorized Burger King Restaurant; (4) BKC and the Defendants sell their products through identical retail outlets to the same customers; (5) the advertising of the parties' products and services is identical; (6) the Defendants clearly intend to pass off Restaurant 171 as an authorized Burger King restaurant by continuing to exploit the BKC Marks; and (7) the Defendants' unauthorized use of the

BKC Marks can have no result other than to cause actual consumer confusion. *See Burger King Corporation v. Majeed*, 805 F.Supp. at 1002–03; *Burger King Corporation v. Hall*, 770 F.Supp. at 637–38.

4. "A licensee who once had authorization becomes associated in the public mind with the licensor or franchisor. When such a party loses authorization but continues use of the mark, 'the potential for consumer confusion is greater than in the case of the random infringer.'" 3 *McCarthy on Trademarks and Unfair Competition*, § 25.07[1], at 25–48.2 (3d ed.) (quoting in part from *Church of Scientology International v. Elmira Mission of The Church of Scientology*, 794 F.2d 38, 44 (2d Cir.1986)).

§ 1115(b)), *aff'd*, 799 F.2d 867 (2d Cir.1986). The Defendants, however, have not raised any of the eight statutory defenses set forth in Section 1115(b). Instead, they argue that BKC acted wrongfully by refusing to enter into a new, successor franchise agreement with them for Restaurant 171 and by allegedly failing to give them proper notice of its decision. According to the Defendants, BKC's actions deprived them of an adequate opportunity to sell Restaurant 171. The Defendants' arguments do not, however, constitute a defense to trademark infringement.

### Notice Was Not a Prerequisite to the Expiration of the Defendants' Franchise Agreement

11. The Defendants' Franchise Agreement is explicit in its terms, specifically providing in Paragraph 1 of the Addendum that "this Agreement ... shall expire on December 30, 1994." It further provides in Paragraph F of the Introduction that "... FRANCHISEE has no contractual right, or BKC any obligation, to renew this franchise or enter into a successor franchise." Most importantly, the notice provision upon which the Defendants rely has nothing to do with the expiration date of their Franchise Agreement. The provision in question, which is contained in Paragraph F, provides that:

> The franchisee not able to satisfy BKC successor standards will be so advised approximately four (4) years prior to the expiration of the term (or upon the occurrence of a disqualifying act during the last four (4) years.) This advance notice period will afford the franchisee ample time and opportunity to recoup the full value of the franchised business through sale to a qualified successor.

By its plain terms, this provision deals only with the issue of the notice the Defendants would receive in the event BKC decided not to enter into a *new*, successor franchise agreement with them, but it has nothing to do with the expiration date of the Franchise Agreement into which the parties had entered.

12. "Where [as here] an agreement provides for termination at a certain time, no notice of termination is necessary." [5] And, provisions limiting the duration of contracts are to be so construed as to effectuate the mutual intention of the parties as evidenced by the language they chose to employ. *See Bales v. Journeymen Barbers', Hairdressers', Cosmetologists' and Proprietors' International Union of America Local No. 867*, 239 So.2d 624, 627 (Fla. 4th DCA 1970); and *Addison Terry Company, Inc. v. N.F.L. Films, Inc.*, 390 F.Supp. 621, 623 (S.D.N.Y. 1974) (while the plaintiff may have envisioned a continuing relationship, the court will not create a contractual obligation in perpetuity where the terms of the contract were clear and "... the facts show that the parties never bargained for more than the 1966–1967 football season"). Here, the expiration provisions in the Defendants' Franchise and Sublease Agreements are self-executing; they depend on nothing, other than the passage of time.

13. While the Defendants argue that the provision in the Franchise Agreement which outlines successorships must be construed in conjunction with the provision of the contract setting forth its expiration term, the language of the Franchise Agreement on expiration is clear and not subject to judicial interpretation. "[I]t is settled law in Florida that a court may resort to the process of interpretation only when the words used in a contract are unclear." *Boat Town U.S.A., Inc. v. Mercury Marine Division of Brunswick Corporation*, 364 So.2d 15, 17 (Fla. 4th DCA 1978). "When that language is clear and unambiguous, the courts cannot indulge in construction or interpretation of its plain meaning." *Hurt v. Leatherby Insurance Company*, 380 So.2d 432, 433 (Fla.1980); *see also Heck v. Parkview Place Homeowners Association, Inc.*, 642 So.2d 1201, 1202 (Fla. 4th DCA 1994). In this case, the Agreements' expiration dates are clear and unambiguous. This Court must give those provisions their intended meaning.

14. Moreover, if BKC did not afford the Defendants enough time to sell Restaurant 171, as they claim, their remedy is an

---

5. 17 C.J.S. *Contracts* § 385(1).

action for money damages, not the continuing infringement of BKC's Marks. The Defendants themselves recognized this when they previously asserted such a damage claim against BKC in both this Court (*Hall v. Burger King Corporation,* 89–0260–Civ–Kehoe) and a related action in the Northern District of Georgia (*Burger King Corporation v. Agad and Balagamwala,* 1:93–CV–898–MHS).

15. This issue was addressed in *Zuckerman v. McDonald's Corp.,* Bus. Franch. Guide (CCH) ¶ 9904 (D.Mass. Oct. 31, 1991), a very similar case to the one *sub judice.* There, franchisees of McDonald's sought a preliminary injunction ordering McDonald's to extend their license to operate their restaurant for an additional two years. The franchisees argued, *inter alia,* that they were entitled to this additional time because McDonald's failed to give them four years notice that their franchise was not going to be renewed. Denying the franchisees' request, the Court noted that the franchisees had no basis for claiming that they were entitled to a two-year extension of their franchise agreement. According to the Court, if the franchisees' chances of selling their franchise were diminished because McDonald's failed to give them four-years notice that they would not be receiving a successor franchise, their only damages were economic. As stated by the court, " '[e]conomic loss alone does not normally rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction.' " *Id.* at 22,630 (citation omitted). More importantly, the court noted that "[i]f plaintiffs succeed in proving a breach of contract, their damages will be calculable, and McDonald's will be capable of paying the award." *Id.* (citation omitted). Here, as in the *McDonald's* case, if the Defendants believe that they were denied an ample opportunity to sell their franchise, their remedy is a claim for money damages— not "holding over" and infringing BKC's Marks.

*This Court Has Previously Held That Wrongful Termination Is Not a Defense in a Trademark Infringement Action*

16. Even if the Defendants could establish that they were somehow wrongfully denied a new, successor franchise agreement, wrongful termination or denial of a franchise agreement is not a defense to an action for trademark infringement. As this Court has previously held, "as a matter of law, a terminated franchisee's remedy for wrongful termination is an action for money damages and not the continued unauthorized use of its franchisor's trademarks." *See Burger King Corporation v. Majeed,* 805 F.Supp. at 1003; and *Burger King Corporation v. Hall,* 770 F.Supp. at 638.[6] Thus, while the Defendants may assert a claim for money damages (a matter the Court is not addressing at this time), they do "... not have the right to continue using the [BKC] trademark[s] as an infringer." *S & R Corporation v. Jiffy Lube International, Inc.,* 968 F.2d at 377–78.

*The Relief Requested by the Defendants is Not Recognized Under Florida Law*

17. Finally, the Defendants are, in essence, seeking a decree of specific performance from this Court requiring BKC to extend the term of their Franchise Agreement or enter into a new agreement. However, under Florida law, franchise agreements are considered personal services contracts. *See Burger Chef Systems, Inc. v. Burger Chef of Florida, Inc.,* 317 So.2d 795, 797 (Fla. 4th DCA 1975), *cert. denied,* 334 So.2d 603 (Fla.1976); *cf. North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.,* 583 F.Supp. 691, 699 (N.D.Ill.1984). And, under Florida law, "[p]ersonal services are not subject to a suit for specific performance." *Burger Chef Systems, Inc. v. Burger Chef of Florida, Inc.,* 317 So.2d at 797. As such, this Court may not order parties to continue the performance of a franchise relationship. 317

**6.** *See also S & R Corporation v. Jiffy Lube International, Inc.,* 968 F.2d 371, 377 (3d Cir.1992); *Burger King Corporation, v. Austin,* Bus. Franch. Guide (CCH) ¶ 9788 (S.D.Fla. Dec. 26, 1990); *Cal City Optical, Inc. v. Pearle Vision, Inc.,* No. 93 C 7577, 1994 WL 114859 (N.D.Ill. Mar. 29, 1994); *Romacorp, Inc. v. TR Acquisition Corporation,* No. 93 Civ. 5394, 1993 WL 497969 (S.D.N.Y. Dec. 1, 1993), *aff'd,* 29 F.3d 620 (2d Cir.1994); and *Little Caesar Enterprises., Inc. v. R–J–L Foods, Inc.,* 796 F.Supp. 1026 (E.D.Mich. 1992).

So.2d at 796. The decision in *Burger King Corporation v. Weaver*, 798 F.Supp. 684 (S.D.Fla.1992), is directly on point. Much like this case, BKC brought an action against a franchisee alleging trademark infringement. The franchisee asserted various counterclaims, including a request that the Court grant injunctive relief requiring BKC to issue him a successor franchise agreement. Holding that such relief was, in substance, a request for a decree of specific performance, the Court dismissed the request. In that decision, Judge Sidney Aronovitz of this Court stated:

> The injunction prayed for by Weaver is a request for a decree of specific performance from this Court. Florida law does not recognize the remedy of specific performance for a franchise agreement, since such an agreement is viewed as a contract for personal services.

*Id.* at 692. *See also North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.*, 583 F.Supp. at 699 ("there is absolutely no precedent for granting specific performance of a franchise contract ... [because it] is at least partially a contract for personal services").

18. In support of their position, the Defendants principally rely on *McDonald's Corporation v. Markim, Inc.*, 209 Neb. 49, 306 N.W.2d 158 (1981), and *Atlantic Richfield Company v. Razumic*, 480 Pa. 366, 390 A.2d 736 (1978). Neither case, however, stands for the proposition that the Court may judicially lengthen the duration of a contract which has an explicit expiration date.

19. In *McDonald's Corporation v. Markim, Inc.*, McDonald's brought an action for a declaratory judgment as to its obligations under the parties' franchise agreements and for an injunction barring the defendants from using its trademarks, trade names and service marks after the expiration of the franchise agreements. The defendant franchisees counterclaimed, asserting that McDonald's had acted in bad faith by failing to renew the franchise agreements without good cause. At issue was a provision in the franchise agreements which required McDonald's to give the franchisees "first consideration" for an additional franchise period of five years at the expiration of the franchise term. Relying on this language, the trial court held that McDonald's had acted in bad faith in failing to renew the subject agreements and entered an injunction requiring McDonald's to extend the franchise agreements for a period of five years. However, the trial court's decision—upon which the present Defendants rely—was reversed, on appeal by the Supreme Court of Nebraska, upon a holding that "[t]he only requirement of McDonald's was that it give the licensee 'first consideration for an additional franchise period of five years.'" *Id.* 306 N.W.2d at 162. According to the Supreme Court, however, this obligation "place[d] no burden of any significance upon McDonald's." *Id.* 306 N.W.2d at 163.[7] In short, McDonald's was not obligated to renew the franchise, its only obligation being compliance with the contract provision requiring "first consideration." Thus, the Supreme Court remanded the action to the trial court with directions that it enter an injunction requiring the defendants to stop using McDonald's trademarks.

20. The Nebraska Supreme Court decision in *McDonald's Corporation v. Markim, Inc.*, actually supports BKC's position. Unlike the provision at issue in that case, the present Franchise Agreement does not contain any language providing that the Defendants will be given "first consideration" for an additional franchise upon the expiration of their agreement. To the contrary, the Defendants' Franchise Agreement provides that "FRANCHISEE has no contractual right, or BKC any obligation, to renew this franchise." The Franchise Agreement further states that the Defendants accepted the franchise " ... with the full and complete understanding that the license expires on December 30, 1994, with no promise or assurance of renewal or the granting of a new license at expiration."

---

7. Subsequent decisions analyzing this same language have expounded on this reasoning, holding that in cases in which the "first consideration" language was at issue, "McDonald's was under no obligation to renew the franchises. The requirement of 'first consideration' places very little burden on McDonald's." *Orchard v. Covelli*, 590 F.Supp. 1548, 1554 (W.D.Pa.1984).

21. The second case relied upon by the Defendants, *Atlantic Richfield Company v. Razumic, supra*, is similarly inapposite. In that case, Plaintiff Atlantic Richfield Company ("Arco") brought suit seeking to eject the defendant from a service station Arco had permitted the defendant to operate pursuant to a "dealer lease." Arco argued that because the underlying lease had expired, it was entitled to terminate the dealership agreement. The defendant counterclaimed, asserting that the parties' relationship was, in fact, a franchise and not a lease, and that Arco could not terminate that relationship without cause. As noted by the court, "[n]othing in the [agreement] set[s] forth the parties' rights and obligations concerning renewal of the agreement." *Id.* 390 A.2d at 739. Finding that the parties' relationship was, in fact, a franchise relationship and not merely a lease, the court held that even though the underlying lease had expired by its own terms, Arco could not terminate its business relationship with the defendant at its pleasure. According to the court, the agreement's ". . . leasehold terminology stating a three year term of occupancy [did] not govern the duration of the comprehensive contractual business relationship between [the defendant] and Arco." *Id.* 390 A.2d at 743.

22. Unlike the agreement at issue in *Atlantic Richfield*, however, the parties' Franchise Agreement in this case *does* provide for the parties' rights and obligations concerning renewal of the agreement and *does* govern the duration of the parties' relationship. Specifically, the Defendants' Franchise Agreement provides that it expired on December 30, 1994, and that the Defendants had no contractual right, nor BKC any obligation, to renew the franchise. Furthermore, BKC has not sought to terminate the Defendants' franchise for Restaurant 171 because the underlying lease expired. As noted above, BKC has sought to enjoin the Defendants' continued operation of that restaurant and the use of BKC's Marks in connection therewith because the parties' Franchise Agreement has expired by its own terms. That Franchise Agreement, unlike the property lease at issue in *Atlantic Richfield*, does govern the comprehensive contractual business relationship between the parties, and its terms must be enforced. Moreover, this action does not involve the termination of a franchise. Rather, this is an expiration case. As subsequent decisions of the Pennsylvania Supreme Court have made clear, "[t]he *Razumic* standards . . . are applicable *only* in the context of an attempt on the part of the franchisor to terminate its relationship with the franchisee." *Witmer v. Exxon Corporation*, 495 Pa. 540, 434 A.2d 1222, 1227 (1981).

## *The Defendants Have Failed To Adduce Evidence Of Any Waiver By BKC*

■ 23. The Defendants' final argument is that BKC somehow waived its right to permanent injunctive relief by delivering some promotional materials to Restaurant 171 subsequent to December 30, 1994. However, the Defendants have presented no evidence that BKC ever intended to waive the expiration date of their Franchise and Sublease Agreements.

24. Under Florida law, "[w]aiver requires (1) the existence at the time of the waiver [of] a right, privilege, advantage, or benefit which may be waived; (2) the actual constructive knowledge thereof; and (3) an[] intention to relinquish such right, privilege, advantage or benefit." *Dade County v. Rohr Industries, Inc.*, 826 F.2d 983, 990 (11th Cir. 1987). *And see Hochman v. Lazarus Homes Corp.*, 324 So.2d 205, 206 (Fla. 3d DCA 1975). And where, as here, "waiver is implied from conduct, the acts, conduct, or circumstances relied upon to show waiver must make out a clear case." *Fireman's Fund Insurance Company v. Vogel*, 195 So.2d 20, 24 (Fla. 2d DCA 1967); *see also Aspen Investments Corporation v. Holzworth*, 587 So.2d 1374, 1377 (Fla. 4th DCA 1991) ("[c]onduct is not held to constitute a waiver unless it does so clearly").

25. Rather than support a finding of waiver, the evidence presented at the trial tended to show that BKC did not deliver, not did it authorize its suppliers to deliver, any trademarked goods to Restaurant 171 after the Franchise Agreement's expiration date. And, to the extent that any promotional items were delivered to Restaurant 171 sub-

sequent to December 30, 1994, those items were actually processed for delivery by BKC prior to the expiration of the Defendants' franchise. While BKC's suppliers may have inadvertently delivered a few items after the expiration of the franchise, an "administrative snafu" such as this is clearly inadequate to support a claim of waiver. *See Baskin-Robbins Incorporated v. Neiberg*, 161 B.R. 606, 610 (Bankr.W.D.Pa.1993) (the inadvertent delivery of promotional materials was not a waiver of Baskin–Robbins' position that it had properly terminated the defendants' franchise agreement).

26. In *Burger King Corporation v. Lee*, 766 F.Supp. 1149 (S.D.Fla.1991), Judge Stanley Marcus of this Court held that BKC had not waived its termination of the defendants' franchise agreement even though in that action BKC itself had continued to sell branded products to the defendants following the termination of their franchise. As Judge Marcus noted:

> [I]t is the defendants' very conduct which places Burger King in a position of choosing between two evils. That is, if after proper termination the defendants refuse to cease utilizing the Burger King Corporation trademarks and continue doing business as a Burger King restaurant, Burger King, as a matter of policy, must choose between continuing to sell a terminated franchisee approved Burger King materials and supplies to ensure the quality of the food products or must cease selling approved Burger King products to a terminated franchisee knowing that they will secure food products from some other source and sell them as Burger King products. Viewed in this light, Burger King [C]orporation's policy-choice of continuing to sell their approved products to insure quality to the consuming public is a reasonable and valid decision under the circumstances created by the defendants and

> should not intrude upon the plaintiff's right or entitlement to a preliminary injunction.

*Id.* at 1156 (quoting *Burger King Corporation v. Moore and Zindel*, No. 89–1023–Civ-Aronovitz (S.D.Fla. August 14, 1989) (emphasis in original)). The court further noted that the defendants had "failed to present any convincing evidence that statements or conduct of BKC misled [them] or caused them to believe that the franchise was not terminated." *Id.* Similarly, the Defendants in this action have failed to produce any evidence that they were somehow deceived into believing that the franchise for Restaurant 171 had not expired. Finally, as was the case in *Burger King Corporation v. Lee*, *supra*, paragraph 18B of the parties' Franchise Agreement states that the failure of BKC to exercise any right or option it has under the agreement shall not constitute a waiver of its right to require exact and strict compliance with the terms of the agreement. As in *Burger King Corporation v. Lee*, this non-waiver provision is enforceable under the circumstances of this action. *Id.*[8]

## D.

*BKC Is Entitled to the Entry of a Permanent Injunction Barring Defendants from Continuing their Infringing Use of the BKC Marks*

27. Having demonstrated that the Defendants' continued use of the BKC Marks at Restaurant 171 constitutes trademark infringement, BKC is entitled to the entry of a permanent injunction. *See American United Life Insurance Company v. American United Insurance Company*, 731 F.Supp. 480, 489–90 (S.D.Fla.1990); and *IC Industries v. I.C. Industries*, 595 F.Supp. 340, 344 (M.D.Fla.1983). As stated by the Ninth Circuit, "[i]njunctive relief is the remedy of choice for trademark and unfair competition

8. The Defendants presented no evidence at trial that they had made, or that BKC had accepted, any royalty or rent payments subsequent to December 30, 1994. Furthermore, BKC clearly indicated that it would not accept payments for Restaurant 171 after December 30, 1994. BKC's counsel sent a letter to the Defendants' counsel on January 24, 1995, advising counsel that it would not accept any payments for Restaurant

171 after December 30, 1994. (Plaintiff's Exhibit # 30.) BKC further advised the Defendants that it would accept any rent paid to it as "holdover rent," which BKC is entitled to retain under the parties' Sublease Agreement in the event Defendants failed to vacate the premises after the expiration date of their Sublease. In sum, there is no evidence that BKC ever intended to waive its legal and contractual rights.

**1510**

cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Century 21 Real Estate Corporation v. Sandlin,* 846 F.2d 1175, 1180 (9th Cir.1988). Section 34(a) of the Lanham Act (Title 15, United States Code, Section 1116) specifically grants the Court broad discretion to fashion an injunction "according to the principles of equity and upon such terms as the court may deem reasonable ..." *See Frostie Company v. Dr. Pepper Company,* 361 F.2d 124, 126–27 (5th Cir.1966). The entry of a permanent injunction is appropriate especially where, as here, no remedy at law could adequately compensate BKC for its injuries from the Defendants' infringing use of the BKC Marks. *See Blue Cross and Blue Shield Association v. Blue Cross Mutual Clinic, Inc.,* 612 F.Supp. 41, 44 (S.D.Fla.1985); and *Polo Fashions, Inc. v. Rabanne,* 661 F.Supp. 89, 99 (S.D.Fla. 1986).

### RULINGS

For the foregoing reasons, Judgment **SHALL BE** entered in favor of BKC permanently enjoining Defendants Idrees S. Agad and Mohammad Iqbal Balagamwala, their agents, employees, representatives, and all persons acting in concert with them, or under their control:

1. From using or displaying BKC's trademarks or service marks, or any other logos, symbols or trade dress of BKC, or any confusingly similar trademarks, service marks, logos, symbols or trade dress, in connection with the advertising, distribution, display or sale of any product or service at Burger King Restaurant No. 171; and

2. Making in any manner whatsoever any statement or representation, or performing any act, likely to lead members of the public to believe that Burger King Restaurant No. 171 is in any manner, directly or indirectly, associated, affiliated, or connected with, or licensed, sponsored, authorized or approved by BKC.

Further, Defendants Idrees S. Agad and Mohammad Iqbal Balagamwala, their agents, employees, representatives, and all persons acting in concert with them, or under their control:

3. Within twenty (20) days of the date of the Judgment herein, (i) shall vacate the premises of Burger King Restaurant No. 171 in accordance with the expiration of their Franchise and Lease/Sublease Agreements; (ii) turn over to representatives of BKC all copies of BKC's MOD Manual, Operations Manual and any other printed materials containing BKC's operating instructions and business practices which the Defendants used or possessed in connection with the operation of Burger King Restaurant No. 171; and (iii) fully comply with the post-termination covenants of the Franchise and Lease/Sublease Agreements.

Further, Defendants Idrees S. Agad and Mohammad Iqbal Balagamwala:

4. Within thirty (30) days after entry of the Judgment in this case, **SHALL** file and serve a report in writing, under oath, setting forth in detail the manner and form in which they have complied with this permanent injunction.

DONE AND ORDERED.[9]

---

9. Insofar as the following motion are unresolved, they are hereupon **DENIED** as *moot:* the Defendants' motion to consolidate this action for purposes of discovery and trial with the related action, Case No. 89–0260–Civ–Kehoe [Docket No. 25]; and the Plaintiff's motion to dismiss the Defendants' counterclaims or to sever the counterclaims from the final permanent injunctive hearing held in this matter [Docket No. 26].