TJOFLAT, GERALD BARD, Associate Judge.
On March 31, 1967, appellant, Carnell Bales, our case number 2331, a barber in Palm Beach County, entered into a written “working agreement” with his Union, the Journeymen Barbers’, Hairdressers’, Cosmetologists’ and Proprietors’ International Union of America Local No. 867, the ap-pellee in this case. He signed the form contract because its terms recited, “the signing of this agreement shall be a requisite to union membership.”
Essentially, the contract was designed to accomplish two objectives: the establishment of fixed minimum prices for haircuts, mud packs and the like, and the designation of the hours and days a barber could work each week. The union considered Bales perpetually bound by these schedules because the parties had provided for the automatic renewal of the contract, without notice, on October first each year. It had also been agreed that Bales resignation from the union would not affect its right to enforce the contract.
A few months after the contract was signed, Bales terminated his union membership and repudiated the agreement. Thereafter, he kept his barbershop open after hours and on Mondays, a union holiday.[1] He also reduced prices. The union *626 was unable to convince him that he was still bound by the contract; and so it brought these injunction proceedings, in the Circuit Court of Palm Beach County, to prohibit him from working overtime or cutting prices.
In his answer to the complaint, Bales alleged that the contract was a nullity because he had signed it under duress, as the result of threats by union officials. Alternatively, he asserted that the contract had been terminated itpon his separation from the union. On the merits, the trial judge resolved the duress issue in favor of the union and concluded that the agreement was perpetual. He held that Bales was powerless to terminate the contract without the union’s consent and ordered him to conform to its price list and work schedule so long as he chooses to barber in Palm Beach County. In the language of the final judgment, Bales was permanently enjoined “from operating his barbershop or from himself working as a barber at such times and hours and for such prices as are in violation of the provisions of the contract.” A motion for rehearing was denied, and this appeal followed.
In his brief, appellant assigned four alternative grounds for reversal: (1) the subject matter of this action is within the exclusive jurisdiction of the National Labor Relations Board, and, accordingly, the trial court lacked authority to entertain the union’s application for injunctive relief; (2) by restricting Bales freedom to practice his trade in Palm Beach County, the contract contravenes the “Right to Work Law”[2] and is thus unenforceable; (3) the agreement is void for want of mutuality; and (4) the contract was terminated. A fifth ground for reversal, asserted initially in the oral argument before this court, is that the price fixing and restraint of trade aspects of the contract rendered it a nullity under the antitrust law of this state. [3]
The first two grounds cited in the brief and the antitrust issue were neither raised in the trial court nor litigated by implied consent.[4] Nothing in the final judgment or any of the pre-trial orders indicates that *627 they were considered and resolved by the trial judge. Accordingly, they will not be entertained by this court on appeal.[5] Mariani v. Schleman, Fla.1950, 94 So.2d 829; Jones v. Neibergall, Fla.1950, 47 So.2d 605. On the other hand, the third and fourth points were expressly adjudicated in the court below and have been properly lodged before us on this appeal.
In support of his third ground Bales argues that mutuality is lacking because every undertaking set out in the agreement is his, whereas the union promised nothing. “Mutuality of obligation” is a way of expressing the proposition that a promise must be supported by adequate consideration to be enforceable. An agreement may have sufficient mutuality, even though one of the contracting parties may have undertaken no duty of future performance, if such party has given a genuine, executed consideration. Here, the union membership and concomitant benefits Bales received when he signed the instrument was a sufficient executed consideration to support the formation of a contract, and, thus, we are not inclined to disturb the trial judge’s conclusion that a binding agreement was reached.
Our decision in this case turns instead on the premise that the agreement has been terminated. Paragraph 16 of the contract provides:
"It is understood and agreed that this agreement is effective from the date of the signing hereof and shall continue until October 1 of the following year and shall then be automatically renewed on the first day of October and each succeeding year without further notice to either party thereto. Each yearly renewal period shall then commence on October 1st. It is provided, however, that either party may open this agreement for bona fide discussion or revisions upon written notice being served by either party upon the other, not less than thirty (30) days prior to the renewal date of this agreement, stating the discussion or revision sought and requesting the consideration thereof at the second ensuing meeting of the Union after said notice. The existing agreement shall remain in effect until any such modification is agreed upon by a majority vote of the then members of the Local Union in attendance at such meeting as may be proper for such vote.”
This language clearly specifies a fixed contract term.[6] It began March 21, 1967, when the document was signed, and ended on September 30, 1968, in keeping with the provision that the contract “shall continue until October 1 of the following year.” The renewal provision enabled the parties to extend the contract term from year to year without the necessity of giving notice. By dispensing with the requirement of notice, they in substance stated that, unless one or the other took some action to conclude the arrangement prior to the October renewal date, the term would be extended. Certainly, Bales’ repudiation of the transaction, upon resigning from the union in September, 1967, amounted to such action.
There is other evidence in paragraph 16 that mitigates against the union’s contention that a perpetual agreement was intended. It is in the modification provision which gives the union the sole power to amend the contract. Both parties were given the right to propose a change in the agreement, but only the union, by the vote of its membership, could bring it about. *628 It takes no subtle analysis to suggest how futile it would have been for Bales to ask the union for a release so he could compete with its members by working longer hours and cutting prices. Such a proposal would have met certain defeat at the union meeting called to consider it. On the other hand, one can readily envision the punishing restraints the membership might have imposed on Bales for violating the contract or engaging in any conduct detrimental to their interests. We would be hard pressed, indeed, to conclude that he intended such an unconscionable arrangement in perpetuity.
The final judgment in case number 2331 is therefore reversed, and the cause is remanded for further proceedings not inconsistent with the views herein expressed.
In the companion and consolidated case of Fred Dunbar, appellant, our case number 2332, for reasons hereinabove set forth, the final judgment is therefore reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.
Reversed and remanded.
CROSS, C. J., and McCAIN, J., concur.

. Under the agreement, the barber was prohibited from working on Sundays, Mondays, and certain specified holidays. Workday hours were from 8:30 o’clock A.M. to 6:00 o’clock P.M.

. Section 12 of the Declaration of Rights, Florida Constitution of 1885, F.S.A., which states, in part: “The right of persons to work shall not be denied or abridged .on account of membership or non-membership in any labor union, or labor organization; provided, that this clause shall not be construed to deny or abridge the right of employees by and through a labor organization or labor union to bargain collectively with their employer.”

. Sections 542.01, 542.05, and 542.10, Florida Statutes, F.S.A., constitute a legislative declaration that agreements to fix the price of services, to prevent competition, or to restrict the full and free pursuit of any lawful trade are void and unenforceable.

. As to appellant’s first point, it should be observed that he cited nothing in his brief that would suggest that this is a controversy over wages, hours or conditions of employment or any other issue within the exclusive jurisdiction of the National Labor Relations Board. The union’s view is that this is not a col-leetive bargaining dispute, but simply a matter of enforcing a contract between a union and one of its members.
In arguing his second point before this court, appellant contended that the following provision of the contract violated the “Right to Work Law”: “It is further agreed that all those working at the trade and eligible to membership according to the Constitution of the National Union shall be members in good standing in the Local Union and that every Journeyman Barber (e. g. appellant Bales) must present a working card to the Proprietor (e. g. appellant Bales) issued by the Union before he is engaged to work, except that the Proprietor shall have the right to hire non-Union Barbers if the Local Union is unable to supply Union help when called upon, provided, however, that any non-Union Barber so employed shall within thirty (30) days make application for membership and be issued a working permit by the Secretary of the Local Union, pending final approval, unless a Union Barber cannot be supplied during the employment of the non-Union Barber.”

. It is not necessary for us to consider whether these issues, raised only at the appellate level, disclose fundamental error, because a decision can be reached on other grounds.

. Paragraph 14 of the contract also implies a fixed term: “It is understood and agreed further, that all provisions of this agreement shall apply to and govern the Barber Shops now operating and controlled by the Proprietor and to any and all other Barber Shops that the Proprietor may hereafter own, operate, or control dunny the term of thin agreement. * * * ” (Emphasis added.)