ORDER GRANTING PLAINTIFF’S EMERGENCY MOTION FOR PRELIMINARY INJUNCTION
 

 K. MICHAEL MOORE, District Judge.
 

 THIS CAUSE came before the Court upon Plaintiff’s Emergency Motion for Preliminary Injunction (filed August 7,1996).
 

 THE COURT has considered the Motion, responses, and the pertinent portions of the record. The Court heard this case as an emergency matter and held a hearing on August 22, 1996. For the reasons set forth below, the Court GRANTS the Plaintiff’s motion for preliminary injunction.
 

 I. BACKGROUND
 

 On August 7, 1996, Plaintiff The Florida Panthers Hockey Club, Ltd. (the “Panthers”) commenced this action against Defendants Miami Sports and Exhibition Authority (“MSEA”) and the City of Miami (the “City”). Count I of the Panthers’ complaint seeks a declaration of its rights under a license agreement between the Panthers and non-party Leisure Management International. Counts II through IV seek injunctive relief and damages arising out of alleged violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.
 
 [1]
 

 
 *857
 
 II. FINDINGS OF FACT
 

 The Panthers is a franchise of the National Hockey League (“NHL”). MSEA is an independent and autonomous authority of the City. MSEA owns the Miami Arena, and the City owns the land upon which the Miami Arena is situated.
 

 On October 10,1986, MSEA, Decoma Miami Associates, Ltd. (“DMAL”) and the City entered into a Land Lease Agreement for the construction of the Miami Arena. Plaintiffs Exhibit (“Pl.Exh,”) 2. On October 19, 1986, MSEA and DMAL executed a contract entitled “Miami Arena Contract” which set forth the rights and obligations of the parties in connection with the operation of the Miami Arena. PI. Exh. 1. On December 13, 1990, MSEA and DMAL entered into the First Amendment to the Miami Arena Contract. PI. Exh. 4. The Miami Arena Contract and the First Amendment will be referred to collectively as “the Miami Arena Contract.” On October 19, 1986, DMAL hired Leisure Management International
 
 [2]
 
 (“LMI”) as an independent contractor to discharge some of DMAL’s responsibilities, including the responsibility for entering into agreements for the use of the Miami Arena. PI. Exh. 3.
 

 On April 2,1993, LMI, on DMAL’s behalf, entered into a license agreement with the South Florida Hockey Club, Ltd., the predecessor to the Panthers. PI. Exh. 5. On June 21,1993, LMI and the Panthers entered into a First Amendment to the Panthers License. PI. Exh. 7. The Panthers License and the First Amendment will be referred to collectively as “the Panthers License.” The Panthers License provided for an initial term of two hockey seasons but gave the Panthers, at its sole discretion, four one-year options to extend the Panthers License.
 
 See
 
 Panthers License, Section 3.01.
 

 Under the Panthers License, the Panthers had to exercise its option to renew for the 1996-1997 hockey season on or before August 1,1995.
 
 See id.
 
 at Section 3.03(b). The Panthers elected not to exercise its option for the 1996-1997 season and advised MSEA to that effect by letter dated May 31, 1995. Defendant MSEA’s Exhibit (“D.Exh.”) 1. In that letter, the Panthers advised MSEA, “This is to advise you that because of the extremely unfavorable economic terms of the License Agreement, we don’t wish to exercise the second one-year option (for the 1996-1997 season). However, if the economic terms of a new License Agreement for the Miami Arena could be obtained which were comparable to those economic terms presently granted to the Miami Heat basketball team, we would seriously consider remaining in the Miami Arena for that subsequent season.”
 

 John Blaisdell, president of LMI, testified that LMI, on DMAL’s behalf, and the Panthers began negotiating a new license agreement. On May 30, 1996, LMI and DMAL entered into an agreement entitled “Second Amendment to License Agreement” (the “Panthers License Amendment”). Blaisdell testified that the terms of the Panthers License Amendment continued to favor MSEA tremendously. Blaisdell further testified that the Panthers License Amendment did not include any material changes from the Panthers License; rather, the terms and conditions of the Panthers License Amendment substantially conformed to the Panthers License. No evidence was offered to the contrary.
 

 By letter dated June 7, 1996, MSEA rejected the Second Amendment to the License Agreement. PI. Exh. 10. In that letter, MSEA indicated that “... we do not believe that the proposed amendments are in the best economic interests of MSEA nor [sic] consistent with the accomplishment of our public purpose. In addition, it is our conclusion that the proposed terms are not reasonably necessary to the operation of the Miami Arena. Instead, we believe that MSEA will be better served by a license which com
 
 *858
 
 menees on August 1, .1996, and expires on July 31, 2006. We reject paragraphs 3, 4, 5 and 6 of the proposed amendments.” By letter dated July 9,1996, MSEA directed the Panthers to vacate the Miami Arena by July 15,1996. PI. Exh. 11.
 

 III. CONCLUSIONS OF LAW
 

 Although a preliminary injunction is an extraordinary remedy,
 
 Shatel Corp. v. Mao Ta Lumber & Yacht Corp.,
 
 697 F.2d 1352, 1354 (11th Cir.1983), it is within the court’s discretion to grant preliminary injunctive relief.
 
 Rey v. Gannett Publishing Co.,
 
 766 F.Supp. 1142, 1145 (S.D.Fla.1991) (citations omitted). To prevail on a motion for preliminary injunction, the moving party must prove: (1) there is a substantial likelihood of success on the merits; (2) there is a substantial threat of irreparable harm; (3) the threatened injury to plaintiff outweighs the harm an injunction may cause to defendant; and (4) the granting of the injunction would not disserve the public interest.
 
 Teper v. Miller,
 
 82 F.3d 989, 992-93 n. 3 (11th Cir.1996);
 
 Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,
 
 51 F.3d 982 (11th Cir. 1995).
 

 The moving party carries the burden of establishing the four elements for injunctive relief by a preponderance of the evidence.
 
 Cafe 207, Inc. v. St. John’s County,
 
 989 F.2d 1136, 1137 (11th Cir.1993). If the movant fails to prove one of the four elements, an injunction should not issue.
 
 Id.
 
 Bearing this standard in mind, the Court finds that the Plaintiff has demonstrated by a preponderance of the evidence that it is entitled to injunctive relief.
 

 A. Substantial Likelihood of Success on the Merits
 

 The question of whether the Plaintiff has a substantial likelihood of success on the merits for the contract claim focuses on whether MSEA has an obligation not to unreasonably withhold consent of the Panthers License Amendment. The Court finds that MSEA does have such an obligation.
 

 The Plaintiff contends that the Panthers License Amendment contains substantially similar terms and conditions as the Panthers License and continues to be a boon for MSEA. The Plaintiff argues that MSEA therefore, cannot unreasonably withhold consent of the Panthers License Amendment and that a preliminary injunction is required to compel approval.
 

 MSEA counters that the Panthers License Amendment is a “personal services” contract and, thus, is not subject to a suit for specific performance. While a personal services contract cannot be enforced by injunction or specific performance,
 
 see Burger King Corp. v. Agad,
 
 911 F.Supp. 1499, 1506 (S.D.Fla.1995);
 
 Montaner v. Big Show Productions, S.A,
 
 620 So.2d 246, 248 (Fl.Dist.Ct. App.1993), the Panthers License Amendment is not such a contract. The Panthers License Amendment is a lease agreement and such an agreement may be subject to specific performance. The Court, therefore, finds that the remedy of specific performance is available. Certainly, specific performance is only available if it appears from the agreement that the rights and obligations of the parties with respect to the terms and conditions of the contract and the actiofis to be taken by the parties are clear, definite and certain.
 
 See generally Drost v. Hill,
 
 639 So.2d 105, 106 (Fl.Dist.CtApp.1994) (citations omitted).
 

 MSEA also counters that, since the Panthers faded to exercise its option to renew the Panthers License, the agreement was effectively cancelled. Further, MSEA argues that cancellation of the Panthers License meant that the Panthers could not enter into a new license agreement. The Court finds MSEA’s argument misleading insofar as MSEA delegated to DMAL the “full and exclusive” power and authority to “negotiate, execute, and perform” contracts including licenses.
 
 See
 
 Section D.7.4 of the Miami Arena Contract. Therefore, even if the Panthers License was cancelled upon the Plaintiffs failure to exercise its option, DMAL/LMI could enter into a new agreement with the Panthers or any other party who desired to use the Miami Arena.
 

 DMAL’s power and authority to enter into contracts for the use of the Miami Arena is limited if the contract involves an Owner Affiliate or “scheduled] events or perfor
 
 *859
 
 manees in the Arena for more than 20 days during any one Operating Year.”
 
 See id.
 
 In those instances, MSEA’s approval of the contract is required. However, the standard for MSEA approval is clearly defined in and limited under the Miami Arena Contract. Section 7.4 of the Miami Arena Contract provides, in pertinent part:
 

 Such Owner approval shall (i) be given by the Chairman of Owner or his designees, (ii) not be unreasonably withheld and (iii) be subject to the standards for Owner review and approval set forth in Exhibit D.6.4.
 

 The relevant portions of Exhibit D.6.4 provides:
 

 Upon receipt of any matter submitted by Operator for review and approval ... Owner shall review the same and shall promptly (but in any event with ten (10) calendar days after such receipt) give Operator notice of Owner’s approval or disapproval, setting forth in detail all reasons for any disapproval. Owner’s right to disapprove any such matter submitted shall be limited to the elements thereof (i) which do not conform substantially to matters previously approved, or in the case of contracts, which contain material provisions less favorable to Owner and Operator than were contained in drafts previously approved by Owner, (ii) which are new elements not previously presented and Operator is unable to demonstrate, in the reasonable judgment of the Owner that such new element is reasonably necessary for performance of the Work, or (iii) which depict matters that are violations of this Contract or applicable Legal Requirements.
 

 (Emphasis added).
 

 MSEA argues that provision D.6.4 is inapplicable to the situation and that MSEA had an unfettered right to disapprove the Panthers License Amendment. The Court rejects this argument. Provision D.7.4 incorporates the standard set forth in D.6.4 for Owner approval, and D.6.4 clearly places limits on an Owner’s right to disapprove a contract. MSEA, therefore, may not unconditionally choose not to follow these standards.
 

 MSEA also argues that it should be allowed to disapprove the Panthers License Amendment because it was negotiated by entities that are owned, in whole or in part, by the same person, H. Wayne Huizenga. It should be noted that the Miami Arena Contract expressly contemplates that DMAL will enter into contracts with its affiliates. In those instances in which DMAL enters into a contract with its affiliates, MSEA is required to approve the contract pursuant to the standards set forth in D.6.4 and D.7.4 of the Miami Arena Contract. Accordingly, MSEA cannot now argue that such a contract is impermissible.
 

 MSEA also argues that this dispute is simply a matter of contract negotiations and, accordingly, the Court should not get involved in negotiations between these parties. The Court finds that, once DMAL/LMI and the Panthers submitted the Panthers License Amendment for approval, MSEA’s rights and obligations to be a part of the negotiations and to approve the Panthers License Amendment became fixed. Since MSEA is unable to identify any term or condition which is materially different or adverse to MSEA, the Court finds that MSEA’s withholding approval of the Panthers License Amendment is unreasonable. Therefore, based on the foregoing, the Court finds that the Plaintiff has established a substantial likelihood of success on the merits.
 

 B. Substantial Threat of Irreparable Harm
 

 MSEA argues that the harm to the Panthers is economic in nature. MSEA relies on
 
 United States v. Jefferson County,
 
 720 F.2d 1511, 1520 (11th Cir.1983) (citation omitted) for the proposition that: “[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.”
 

 The Court, however, disagrees with MSEA that the irreparable harm is merely economic in nature and that money damages can adequately compensate the Panthers should it
 
 *860
 
 ultimately succeed on the merits. The overwhelming evidence presented establishes that the Panthers’ existence and success rests, in large part, on the interest and loyalty of the fans. As William Torrey and Brian Burke testified, the potential harm to the Panthers is incalculable and extends beyond the financial injury. If the Panthers cannot play in the Miami Arena, it may lose home game advantage and may lose goodwill among its fans. Further, the Panthers’ relationship with the NHL may be adversely affected.
 

 C. Balancing the Harm
 

 The inquiry under the third prong of a preliminary injunction motion requires the Court to determine whether the threatened injury to the movant outweighs the harm that an injunction may cause to the nonmovant. The Court is satisfied that the Plaintiff has demonstrated its potential injury outweighs any harm the injunction may cause to MSEA. Indeed, the Panthers License Amendment, in all likelihood, will extend for only two years and will allow MSEA to collect substantial revenues from the use of the Miami Arena which otherwise would be lost if MSEA did not approve the Panthers License Amendment. Whatever other inexplicable reasons MSEA may have for failing to approve the Panthers License Amendment, it is abundantly clear to the Court the MSEA’s dissapproval is to its own economic disadvantage.
 

 D. The Public Interest
 

 The Court finds that an injunction would not disserve the public. Indeed, professional sports serves the public interest and, in this particular instance, the Panthers Lease Amendment provides economic benefits to the public.
 

 III. CONCLUSION
 

 Based on the foregoing, it is ORDERED AND ADJUDGED as follows:
 

 1. Plaintiff’s Emergency Motion for Preliminary Injunction is GRANTED.
 

 2. Defendant MSEA is hereby enjoined from preventing the Panthers from utilizing the Miami Arena in accordance with the terms and conditions set forth in the Panthers License Amendment dated May 30, 1996.
 

 3. Plaintiff is directed to deposit a bond in the sum of Ten Thousand Dollars ($10,-000.00) with sureties to be approved by the Court. Said bond shall be deposited with the Clerk of Court no later than 10 a.m. on August 26,1996.
 

 4. Copies of this Order may be served by the Panthers, its employees, or its agents upon any individual or corporate entity that may be subject to this Order.
 

 5. The Court retains jurisdiction of this matter for all purposes including the enforcement of this Order, should enforcement prove necessary.
 

 [1]
 

 . MSEA has filed a motion to dismiss the Pan-filers' antitrust counts on the basis of antitrust
 
 *857
 
 immunity. The City informed the Court during the hearing that it also would file a motion to dismiss the antitrust counts. Accordingly, the Court reserves ruling on the antitrust counts until the City has had an opportunity to file its motion to dismiss.
 

 [2]
 

 . Facility Management and Marketing d/b/a Leisure International ("FMM”) was the original party to the October 19, 1986 agreement. In 1987, FMM assigned its interest in the agreement to Leisure Management Miami ("LMM”). LMM then reorganized into LMI.