OTTAWA COUNTY COMMISSIONERS, APPELLEE, *v.* MITCHELL, APPELLANT, ET AL.

(No. OT-84-9—Decided October 12, 1984.)

*Dale A. Kline,* for appellee.
*John A. Coppeler,* for appellant.

HANDWORK, J. This case is before the court on appeal from the Ottawa County Court of Common Pleas, which granted plaintiff-appellee's motion for specific performance of a purported settlement agreement.

I

This is an appropriation case involving the property of Tom L. Mitchell, defendant-appellant herein (hereinafter "appellant"). Plaintiff-appellee is the Board of Commissioners of Ottawa County (hereinafter the "commissioners" or the "county").

On September 29, 1981, the commissioners instituted an appropriation action in the trial court for the ultimate purpose of installing a public sewer line across appellant's lakefront property, the sewer line being part of Ottawa County's Danberry Township sewer project. Appellant filed an answer to the petition on November 18, 1981.

Appellant had purchased the property in question in 1959. He and his son, John Mitchell, had developed the land through their partnership into a family campground and picnic area. In 1967, appellant made tentative plans to construct a boat ramp and hoist, in addition to converting a small brick house on the property into a store and recreation hall. The brick house stands near the lakeside of the property, known as East Harbor.

The county's sewer plan called for two easements, one running north and south, the other east and west. The present controversy initially began with the proposed location of the east-west easement which would hold the main sewer line. The county planned to install this sewer north of the brick house, thereby cutting in half the East Harbor property. Throughout this litigation, appellant has steadfastly rejected this proposal as unacceptable, because, in his view, it would destroy the most valuable feature of the land. Hence, appellant and his son refused to grant any easement to the county north of the brick house. They have at all times insisted that any such easement for a sewer line be located south of that structure.

A pretrial conference concerning these and other matters was held on December 19, 1981. Appellant and his son were not yet represented by counsel. Appellant voiced his concerns about the location of the east-west easement and his desire to see it put south of the brick house. He further informed county representatives of the other conditions necessary for settlement of the action. County representatives were apparently adamant about putting the sewer line north of the brick house, advising appellant that he should retain an attorney for trial. The record indicates that on January 19, 1982, appellant retained attorney John A. Kocher to represent him.

Appellant and his son drafted a list of "conditions for settlement," dated "12/28/81," and gave a copy of these conditions to Kocher. These "conditions" were as follows:

"1. *Eliminate* [sewer] line up Kimmel Drive *or reposition* to east lot line for a substantial reduction in [temporary] & [permanent] easements. * * *

"2. Relocate east-west sewer line to existing driveway south of brick storage building and settle for $3605 offer.

"3. Use only right of way granted by easement for vehicle, machinery and foot traffic.

"4. Keep property cables locked at all times when no construction people are on site.

"5. Relocate 3 service connections as agreed upon and indicated on drawings.

"6. Place Spec. B. 2. 4. 86 in the settlement agreement (land condition).

"7. Place Spec. C02200-10 in the settlement agreement (water condition)." (Emphasis *sic*.)

The record further discloses, through the testimony of appellant and his son, that Kocher was authorized to *negotiate* only for an *offer of settlement* from the commissioners — and only for an offer consistent with the stated "conditions" for settlement, their primary concern being the relocation of the east-west sewer line south of the brick building. The record also discloses that appellant refused to allow any sewer construction to begin on his property until these settlement conditions were met, the offer approved and the appropriate documents signed by him for granting the easements to the county.

After an initial offer had been re-

jected, Kocher met with counsel and other representatives for the county on January 25, 1982. Neither appellant nor his son was present at this meeting. Commissioner James A. Mazur, who is a practicing attorney and who attended the meeting, testified that he asked Kocher if he had the authority to negotiate a settlement for his clients. According to Mazur, Kocher assured him that he had "full authority to negotiate and settle the case." The meeting ended with a proposed settlement figure of $5,000 and, Kocher believed, a tentative agreement by the county that the east-west sewer line would be installed south of the brick building and that no construction would begin until the easement documents and settlement agreement were approved and signed by both parties. Kocher eventually contacted appellant and informed him of the county's offer, including its desire for a temporary easement along an access road onto the property (known as Kimmel Drive) for construction vehicles.

Following the January 25 meeting, Kocher also drafted a letter to the county's attorney, Dale Kline. This letter, dated January 26, 1982, and signed by Kocher, has become the focal point of the disputed issue of whether a settlement was merely offered or proposed or whether it had, in fact, been reached. The letter states:

"Dear Dale:

"Confirming our conversation of January 25, 1982, involving Mr. Tom L. Mitchell, it is my understanding of the settlement that the permanent easement for Kimmel Drive would be eliminated; however, a temporary easement for ingress and egress for the construction vehicles will be allowed. The interceptor sewer will be installed as planned, including the manhole.

"Further, total compensation for the easements has been affixed at the sum of $5,000.00. Upon receipt of the easements, I will send them to Mr. Mitchell and Stella E. Mitchell to obtain their signatures.

"I appreciate your cooperation in resolving this matter.

"Very truly yours,

"/s/John

"John A. Kocher"

Either before this letter was drafted or shortly thereafter, county sanitation personnel entered onto appellant's property and installed the main sewer line north of the brick house. (The record is not clear as to the exact date.) However, no easement documents were ever signed by appellant,[1] nor did he accept the sum of $3,606 that had been deposited by the county in the county clerk's office when the appropriation action was filed.

On May 14, 1982, Kocher filed a motion in the trial court to permit himself to withdraw as appellant's attorney, which the court granted on May 17. Appellant's present attorney, John A. Coppeler, entered an appearance on May 19, 1982. Discovery proceedings thereafter commenced and depositions were taken by the parties. On August 9, 1983, appellant filed an amended answer to the county's original petition. Not until October 11, 1983, did the commissioners move for a court order specifically enforcing "the agreement of compromise and

---

[1] On January 28, 1982, Kline drafted and sent a letter to Kocher, accompanied by certain documents for granting temporary and permanent easements to the county and some proposed journal entries for dismissing the case. In part, Kline's letter stated:

"Dear John:

"Pursuant to your letter of January 26, you will find enclosed a *proposed* easement from the Mitchells, with Kimmel Drive's easement restricted to a temporary easement for ingress and egress for construction vehicles." (Emphasis added.)

settlement" into which the parties had allegedly entered. The motion also sought orders granting the easements in question and declaring damages to be in the "agreed upon" amount. The commissioners' motion referred to Kocher's letter as evidence of "the agreement."

A hearing was eventually held on the commissioners' motion. Post-hearing briefs were also filed. Kocher filed a post-hearing affidavit, which avers, in pertinent part:

"3.   * * *

"* * *

"E.   The next entry in my file of significance was a January 25, 1982 meeting again with the same parties [county representatives] present to discuss the situation. My same concerns were again voiced that we did not want any construction upon the real estate in question prior to having the easements and agreements signed by all parties. Assurances were given by Mr. Kline and Mr. Fry that my clients [sic] wishes would be honored.

"F.   It is my recollection then that [on] January 26, 1982 I wrote the letter to Mr. Kline requesting the written easement which I would recommend to my clients to settle the matter.

"G.   The letter of January 26, 1982 was written to Mr. Kline without the knowledge or consent of my clients, but with the understanding that a number of other agreements would be kept by the county. The letter was not to be a complete and final expression of a settlement but was instead intended to elicit a written proposal from the county incorporating the various matters upon which agreement had been reached.

"H.   The next thing I remember is John T. Mitchell called me and said the [county] contractor had trespassed upon the property without his or his dad's permission.

"* * *

"J.   The county did not at any time submit written easements or a settle-ment agreement, and breached various committtments [sic], including, among others, obtaining signed easements before entering the Mitchell property, providing security for the property, and paying additional compensation to the Mitchells."

On February 9, 1984, the trial court entered a judgment granting the commissioners' motion for specific performance. This appeal followed.

## II

## A

In bringing this appeal, appellant presents three assignments of error for review, the second and third of which are:

"II.   The trial court erred in ordering specific performance of a purported settlement agreement because there was no meeting of the minds which is essential to the formation of such an agreement, and because defendant's then attorney was unauthorized to enter into such a settlement agreement.

"III.   The trial court erred in ordering specific performance of a purported settlement agreement because the agreement violates the Statute of Frauds."

The narrow issue raised by these assignments involves, for the most part, the law of agency. The general rules of agency in Ohio have elsewhere received much scholarly treatment, and we will forego a lengthy discussion of them here. See, e.g., Foust v. Valleybrook Realty Co. (1981), 4 Ohio App. 3d 164. It is instructive, however, to review briefly the few pertinent cases that have applied agency principles to the same (or similar) facts.

We are here presented with the issue of an attorney's authority to negotiate and settle his client's claims in a case involving the transfer, for value, of real estate which the client owns, including the sale or conveyance of an interest in such property. In this case,

Kocher's authority to act for appellant regarding the easements is controlled by those cases involving the authority of agents to bind their principals in real estate transactions. See *Morr* v. *Crouch* (1969), 19 Ohio St. 2d 24 [48 O.O.2d 43]; *Spengler* v. *Sonnenberg* (1913), 88 Ohio St. 192.

The property interests sought by the county in this case are the easements. The granting of an easement, for value, constitutes the sale or conveyance of an interest in land for the purpose of the Statute of Frauds. See 36 Ohio Jurisprudence 3d (1982) 410, Easements and Licenses, Section 21; *Henson* v. *Stine* (1943), 74 Ohio App. 221, 224 [29 O.O. 342] (an "interest" in real estate, such as an easement, can be conveyed only in a manner consistent with the statutory requirements for the transfer of real estate); *St. Michaels Church* v. *Clark* (1930), 37 Ohio App. 200 (compliance with the Statute of Frauds is necessary to create an easement by conveyance).

In this specific context, the rule regarding an attorney's authority is clear. Unless the attorney has been expressly authorized to do so, he has no implied or apparent authority, solely because he was retained to represent the client, to negotiate or settle the client's claims. See *Morr* v. *Crouch, supra,* at paragraph two of the syllabus; *Klever* v. *Stow* (1983), 13 Ohio App. 3d 1, 4; *Tedrich Furniture Co.* v. *Tisdale* (1958), 106 Ohio App. 345, 347 [7 O.O.2d 91]. Cf. *Ohio State Tie & Timber, Inc.* v. *Paris Lumber Co.* (1982), 8 Ohio App. 3d 236, 239 ("* * * counsel has no implied authority to settle a case"). See, also, 6 Ohio Jurisprudence 3d (1978) 657, Attorneys at Law, Section 127.

When he has been retained to represent the client in matters concerning the client's real estate, the existence of the attorney's *express* authority to act on his client's behalf is absolutely crucial to the efficacy of his dealings with other parties. In the only case directly on point, *Morr* v. *Crouch, supra,* the Ohio Supreme Court held, in the second and third paragraphs of the syllabus:

"2. An attorney who is without special authorization has no implied or apparent authority, solely by virtue of his general retainer, to compromise and settle his client's claim or cause of action.

"3. Where the power claimed for an attorney is to sell real estate, the agent's authority must be expressly given before a contract for the sale of land will bind the client."

The relevant facts in *Morr* v. *Crouch,* an appropriation case, are virtually indistinguishable from the facts *sub judice.* In addressing the issue of the attorney's authority to sell or convey the client's real estate through a settlement agreement, the Supreme Court upheld the long-standing principle that authority of this nature must be expressly given. Implied or apparent authority is not enough, the mere retention of an attorney being insufficient to confer such express authority. See *Morr* v. *Crouch, supra,* at 27-28. The *Morr* court also stated, at pages 28-29:

"The record here discloses that no specific authority was conferred upon the attorney to act as agent for the owner to sell or to convey the land. Neither could such authority be implied, nor was it apparent. Attorney Moore, in testifying at the hearing on the motion to vacate [the judgment entry of settlement], admitted that he was not given authority to sell or settle. He testified further that he was mistaken as to who actually held title to the land, believing that the owner's husband was a part owner. Accordingly, the document [filed by the court] entitled 'journal entry — settlement,' *although signed by the attorney for the landowner,* was not an enforceable contract for the sale of land. *A fortiori,* it was not a valid conveyance of title." (Citation omitted; emphasis added.)

## B

There is, more importantly, the problem of proof. While the express authority to negotiate and enter a real estate agreement for the client (or what amounts to such an agreement) *may* be shown by parol evidence, the better practice is to reduce the authority to a writing, detailing the nature and scope of the attorney's authority to act, including specific limitations, if any. Parol agreements of this kind are simply not favored in the law. See *Morr* v. *Crouch, supra,* at 28 (quoting from 3 American Jurisprudence 2d [1962] 514, Agency, Section 118), and *Spengler* v. *Sonnenberg, supra,* at 199. Where it is claimed that the express authority to act in such matters was verbally conferred by the client, *clear and convincing evidence* is required to establish the fact — a mere preponderance of even the credible evidence is insufficient. See *Spengler* v. *Sonnenberg, supra,* at paragraph three of the syllabus. See, also, *Cast Stone Co., Inc.* v. *McGown* (App. 1951), 60 Ohio Law Abs. 545, 550 ("clear and unequivocal" evidence of the agent's authority to sell real estate is needed to bind the principal).

Here, the evidence offered to establish Kocher's express authority to act for appellant and bind him to the putative "settlement agreement" was woefully inadequate. Aside from Mazur's testimony (on which we will comment shortly), the testimony of Tom and John Mitchell, the "conditions for settlement," the Kocher affidavit, the unsigned easement documents and the unclaimed deposit all provide the evidentiary context within which Kocher's letter must be evaluated.[2] When read in that context, it becomes clear that the letter does not state the finalized terms of a settlement, but merely outlines a *proposed* or contemplated settlement which awaited appellant's formal approval in writing. Indeed, Kocher's letter is so ambiguously drafted[3] that one could not reasonably rely on it as a final and complete memorandum of all the terms and conditions to which appellant and the county had allegedly agreed. The very specific "conditions for settlement" are not even mentioned, nor is the letter "signed by the party to be charged" (here, appellant). See R.C. 1335.05. Nevertheless, the pertinent question is: What is the best evidence of

---

[2] In *Morr* v. *Crouch* (1969), 19 Ohio St. 2d 24, 29 [48 O.O.2d 43], the Supreme Court found two facts particularly significant:

"* * * The instant facts are that the landowner [Crouch] received an *unsigned* copy of the * * * [journal entry of settlement]. It is entirely logical that she assumed no deed or sale of her land could be valid without her signature, particularly in view of the fact that the entry called for signatures but the copy she received showed no signatures. She never claimed or received the money deposited in court by the state, even after notice from the judge that it was there. It appears that when she finally learned that the land was no longer listed in her name on the county records, she promptly made efforts to disaffirm, which finally resulted in the filing of the motion to vacate the entry." (Emphasis *sic.*)

Similarly, in this case, appellant did not sign the easement documents and, as far as the record shows, did not claim the money originally deposited with the county clerk when this appropriation action was filed. See R.C. 163.06(A) and (C).

[3] For example, Kocher's letter states, in part:

"* * * The * * * sewer will be installed as planned, including the manhole."

Ambiguities abound. *E.g.,* "as planned." At what point in time? And, more importantly, where? South of the brick house? North of it? Also, the letter initially begins with the words:

"*Confirming* our conversation of January 25, 1982, * * *." (Emphasis added.)

Kocher's authority to bind appellant to any agreement regarding the easements?

As noted earlier, Mazur testified that Kocher assured him of his authority to act for appellant. Yet, Kocher's own assurances, whatever they may have been, are not controlling. In the first place, Mazur's testimony regarding such representations is pristine hearsay, and is therefore inadmissible, being offered as it was to establish the fact and scope of Kocher's agency. See *Morris Arnoff Realty Co.* v. *Bryant* (1928), 28 Ohio App. 356, 359-360. Moreover, whatever an agent may say about his specific authority to act for his principal, the law requires more to establish that authority than his own bare statements. Even apart from their hearsay nature, such assurances, standing alone, can never be satisfactory (or sufficient) proof of the agent's express (or special) authority. To hold otherwise would fly in the face of this well-settled rule. See *Gen. Cartage & Storage Co.* v. *Cox* (1906), 74 Ohio St. 284, 292; *Bourdelis* v. *Trinity Cathedral* (1929), 31 Ohio App. 38; *John Bright Shoe Stores Co.* v. *Scully* (1926), 24 Ohio App. 15, 18. See, also, *Gen. Motors Corp.* v. *Keener Motors, Inc.* (C.A. 6, 1952), 194 F. 2d 669, 673; 3 Ohio Jurisprudence 3d (1978) 293, Agency, Section 194.

Furthermore, because Kocher was a *known* agent for appellant, the county representatives had a duty to ascertain the scope and limitations of his authority to negotiate and enter a written settlement agreement conveying the easements to the county. See *Price Bros. Co.* v. *Walters* (App. 1951), 65 Ohio Law Abs. 443; *Dieterle* v. *Bourne* (App. 1943), 40 Ohio Law Abs. 550, 561; 3 Ohio Jurisprudence 3d (1978) 75, Agency, Section 47. The law, on this point, is also well-settled:

"* * * The fact that the owner of real estate employs an agent to find a purchaser for it, does not raise an implication that the agent is authorized to make a written contract with reference to it. * * * If the agent assumes to make a contract in excess of this authority, the agreement is void and unenforceable. *Where special power is conferred upon an agent, persons dealing with him are bound to ascertain the extent of his power.* * * *

"It would seem that the justice and salutary force of these rules would be obvious. The owner of land is not bound to perform any contract for its sale unless it is in writing. A prospective purchaser is presumed to know that such is the law. *When he deals with the person who claims to have verbal authority to sign such a contract as the agent of the owner, he does so with the knowledge that the principal will not be bound unless he had specially authorized the agent to make the contract which he assumes to make.* The statute of frauds itself is but the expression of a wholesome desire to avoid some results of the infirmities of human nature." (Citations omitted; emphasis added.) *Spengler* v. *Sonnenberg, supra,* at 199-200.

In this case, the evidence fails to establish, clearly and convincingly, that appellant had given Kocher the express authority to bind him to a settlement agreement without his final, written approval of the terms thereof. Accordingly, appellant's second and third assignments of error are well-taken.

### III

Appellant's first assignment of error is as follows:

"The trial court erred in denying defendant a right to a jury trial in this appropriation case and instead granting plaintiff's motion for specific performance of a purported settlement agreement."

This assignment of error appears to be premature, insofar as the trial court did not specifically deny appellant a jury trial on the issue of compensation for the

easements (and other damages), but instead denied a jury trial on the issue of whether a valid settlement agreement — in effect, a contract — had been reached. With respect to the compensation issue arising from the county's appropriation of appellant's property, we again turn to the Supreme Court's observations in *Morr* v. *Crouch, supra,* at page 27:

"A landowner has the constitutional right to a jury's determination of the amount of compensation. Section 19, Article I, Constitution of Ohio. On the other hand, if the appropriating agency and the landowner agree upon an amount, a contract of settlement may be entered into and the action dismissed. However, there is no authority in the court itself to compel a settlement. Nor can the court, by its imprimatur, validate a settlement which is otherwise unenforceable, and attempt to give it the dignity of an instrument to convey title. * * * [A journal entry of settlement] can have no validity beyond its validity as an executory contract to sell land."

Since we have concluded that Kocher had no authority to enter a binding agreement without appellant's written approval, the trial court's journal entry of settlement is void. *Morr* v. *Crouch, supra.* The parties are again in the respective positions they occupied prior to the erroneous entry of settlement. However, unless or until the trial court refuses to empanel a jury to determine the compensation issue between the parties, appellant's first assignment of error is premature and, therefore, without merit. Accordingly, it is not well-taken.

On consideration whereof, the judgment of the Ottawa County Court of Common Pleas is hereby vacated and held for naught. This case is remanded to said court for further proceedings consistent with this opinion. Costs to abide final determination.

*Judgment vacated.*

CONNORS, P.J., and DOUGLAS, J., concur.