OPINION
Defendants-appellants, Rudolf W. Gunnerman and A-55, L.P. ("A-55"), appeal a June 19, 1997 judgment entry (the "June 19 judgment") rendered in the Fayette County Court of Common Pleas, requiring specific performance of a license agreement relating to A-55 fuel technology[1] to the benefit of plaintiff-appellee and licensee, Richard J. Schneider. In a separate appeal, appellants challenge a November 25, 1997 judgment entry (the "November 25 judgment") in which the trial court sought to enforce the June 19 judgment. On February 2, 1998, this court consolidated the two appeals. We initially address the appeal from the June 19 judgment and limit the discussion of the facts accordingly.
Schneider, a former Air Force Staff Sergeant, resides in Washington Court House, Ohio. During his tenure in the Air Force, Schneider served as an aircraft mechanic, flight mechanic, and flight engineer. Schneider also has a civilian educational and occupational background in aircraft engineering. For about one year, Dwight Coffman, a friend of Schneider, had been visiting Schneider's home to discuss "getting involved in projects" related to alternative fuels. Schneider testified that he was not interested because, in his experience, claims of alternative fuel technology were often exaggerated. Despite Schneider's reluctance, Dwight Coffman arranged for Schneider to meet Larry Heim. Heim represented that he worked with A-55 and gave Schneider his first introduction to A-55 fuel technology.
In August 1993, Schneider went to San Francisco with Dwight Coffman and his wife, Evelyn. After arriving in San Francisco, Dwight informed Schneider that Heim wanted to meet with Schneider in Oregon to further discuss the A-55 fuel technology. Soon thereafter, Schneider had a meeting with the Coffmans and Heim. Heim wanted Schneider to visit A-55's headquarters in Reno, Nevada to evaluate the A-55 fuel technology.
In September 1993, Schneider went to Reno to get Dwight Coffman "off [his] back." Heim met Schneider at the airport. On September 17, Schneider had a meeting with Rudolf Gunnerman, CEO and president of A-55, and Heim. Heim did not have a title, but Schneider felt "it was obvious that he was one of the top three or four people" at A-55. Schneider remembered that Heim had an office at A-55. In a subsequent meeting, Gunnerman told Schneider that "Larry would probably be coming on something in the capacity of general manager or title [sic] hadn't been decided yet but in the capacity of a top manager of some sort."
After signing a confidentiality agreement, Schneider was given access to the A-55 fuel technology. After seeing the technology, Schneider was sufficiently impressed to invest in A-55. An agreement was memorialized in a September 20, 1993 letter. The letter states in relevant part:
 September 20, 1993 Mr. Rick Schneider * * * Washington C.H., Ohio
Dear Mr. Schneider:
 It was a pleasure meeting with you on Friday, September 17, 1993 in Reno. We are excited at the prospects of you becoming a member of our A-55 team, both in aircraft applications and as a partner.
 I would like to briefly outline our discussions regarding your involvement.
A-55 L.P. Limited Partner Participation
 Rick Schneider will form a company to invest in the A-55 L.P. as a limited partner under the terms of the A-55 L.P. partnership agreement. Rick Schneider will be the sole contact person between the A-55 L.P. and this company.
 On or before September 30, 1993, Mr. Schneider and/or investment company will invest US $250,000 into the A-55 L.P. in return for 1/4 of 1% (one quarter of one percent) in the Partnership. This investment will be referred to as the "initial investment." Method of monetary transfer will be discussed over the following days.
 With initial investment, Mr. Schneider and/or investment company are granted the right to purchase up to an additional 4 and 3/4% (four and three quarter percent) of the A-55 L.P. at a price of U.S. $1,000,000 per percentage point. The right to invest up to 5% (five percent) in the A-55 L.P. is granted for a period of 60 days from the later of initial investment date or September 30, 1993. The 60 day period can be extended upon mutual written agreement.
* * *
Aircraft Application License
 With initial investment, Mr. Schneider is granted an exclusive world wide license by the A-55 L.P. and Mr. Gunnerman to develop, market and sublicense aircraft applications using the A-55 Technology. It is expressly understood that this license is limited to aircraft applications only and is restricted to the terms of the A-55 L.P. partnership agreement and related license agreements. Time limits on exclusivity will be determined upon milestones such as FAA approval and will not be unreasonably restricted.
 The license fee charged under above scenario will be US $1 plus other valuable consideration. An alternative license fee will have to be discussed should the initial investment not be made.
* * *
 I will attempt to produce a video in a reasonable amount of time. The A-55 Business Plan should be available for your review within approximately one week. If the above terms are consistent with your understanding, please sign below and return with your initial investment payment on or before September 30, 1993.
Very truly yours,
 /s/ /s/ Rudolf W. Gunnerman Rick Schneider
Gunnerman signed the letter September 20, 1993 and mailed it to Schneider's Washington Court House home. Schneider received the letter and signed September 30, 1993. The letter provided that, upon completion of the initial investment, Schneider would receive a license to use A-55 technology for aircraft applications (the "license"). In the same month, Schneider began to form the Schneider Group, an off shore investment company incorporated under the law of the Turks and Caicos Islands. The purpose of the Schneider Group was to establish the "investment company" referenced in the September 30 agreement. The Schneider Group included Schneider as well as potential investors in A-55, including the Coffmans.
On October 1, 1994, John Gilvesy, the Schneider Group Secretary, sent $10,000 to Gunnerman as an earnest money deposit on the initial investment. On October 16, 1993, Gunnerman received four additional checks from Gilvesy: one for $40,000, two for $50,000, and one for $100,000. The parties agreed to extend the September 30, 1993 deadline for the initial investment until October 16, 1993. Gunnerman deposited the $40,000 check in an A-55 account, but the other checks bounced. In order to complete the initial investment, Schneider arranged for Evelyn Coffman, Treasurer of the Schneider Group, to send a $200,000 check to Gunnerman on October 26, 1993.
The Schneider Group eventually raised 1.54 million for investment opportunities in A-55. Beginning in September 1993, Schneider was in Reno or "on the road" marketing the A-55 fuel technology and raising additional funds for A-55. Schneider also participated in demonstrations of A-55 technology in Reno and in Minnesota.
Having not yet received the license by the fall of 1994, Schneider began to get impatient with Gunnerman. In October 1994, he went to Reno to discuss the license with Gunnerman. Gunnerman told Schneider that he had "no license" for the first time. This dispute was never amicably resolved and Schneider filed a complaint against appellants for specific performance of the agreement embodied in the September 20, 1993 letter (the "September 30 agreement").
After a bench trial, the court found that the September 30 agreement "is a binding contract; that the [appellants] are in breach of that agreement; and that [Schneider] has no adequate remedy at law. It is accordingly ordered that the [appellants] perform their obligations under the contract."
 From the June 19 judgment, appellants present seven assignments of error for our review:
Assignment of Error No. 1:
 The Trial Court Erred to the Prejudice of Defendants in Granting Specific Performance in Favor of Plaintiff Because the Court's "Construction" of the September 20, 1993 Letter is Erroneous as a Matter of Law.
Assignment of Error No. 2:
 The Trial Court Erred in Granting Specific Performance in Favor of Plaintiff Because There Was No Waiver of the Condition Precedent That the License Was Contingent Upon Payment by a Specified Date.
Assignment of Error No. 3:
 The Trial Court Erred as a Matter of Law in Ordering Defendants to Perform Their Obligations Under the September 20, 1993 Letter Because the Essential Prerequisites for Specific Performance Were Absent.
Assignment of Error No. 4:
 The Trial Court Erred in Granting Specific Performance in Favor of Plaintiff Because Agreements Concerning Personal Services Cannot Be Specifically Performed.
Assignment of Error No. 5:
 The Trial Court Erred in Granting Specific Performance Because Plaintiff Had Assigned any Right to the License to a Non-Party.
Assignment of Error No. 6:
 The Trial Court's Judgment Should Be Reversed Because of the Absence of Personal Jurisdiction.
Assignment of Error No. 7:
 The Trial Court Erred in Granting Judgment Against Defendant Rudolf Gunnerman.
In the first assignment of error, appellants argue that the trial court misinterpreted the September 30 agreement as a matter of law. "If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." Inland Refuse Transfer Co. v. Browning-Ferris Industries of Ohio, Inc. (1984), 15 Ohio St.3d 321, 322. "However, if a term cannot be determined from the four corners of a contract, factual determination of intent or reasonableness may be necessary * * *." Id. Appellants' position is that the September 30 agreement unambiguously provided two separate opportunities for investment: (1) to receive the license upon timely payment of the initial investment, and/or (2) to invest in A-55.
It is undisputed the $200,000 check from Evelyn Coffman was not paid by the revised October 16, 1993 deadline. However, the trial court concluded that appellants waived the timeliness requirement by depositing the $200,000 check in an A-55 bank account, completing the initial investment. The trial court reasoned that, due to appellants' waiver, Schneider was entitled to the license. Appellants contend that the $200,000 merely represented a separate opportunity in the letter to invest in A-55 and that Schneider is not entitled to the license. We disagree.
The September 30 agreement defines $250,000 as the amount of the "initial investment." Under the heading, "Aircraft Application License," the letter states "[w]ith initial investment, Mr. Schneider is granted an exclusive world wide license by the A-55 L.P. and Mr. Gunnerman to develop, market and sublicense aircraft applications * * *." The letter continues: "With initial investment, Mr. Schneider and/or investment company are granted the right to purchase up to an additional 4 and 3/4% (four and three quarter percent) of the A-55 L.P. at a price of US $1,000,000 per percentage point. The right to invest up to 5% (five percent) in the A-55 L.P. is granted for a period of 60 days from the later of the initial investment date or September 30, 1993." (Emphasis added.)
In appellants' view, the second sentence means Schneider and/or Schneider Group could invest 5% in A-55 L.P. without completing the initial investment. Thus, by accepting Evelyn Coffman's $200,000 check on October 26, 1993, appellants did not waive the October 16, 1993 deadline. Instead, the $200,000 check was part of Schneider and/or Schneider Group's separate opportunity to invest in A-55.
This reading of the letter is strained. The logical view is, having made the initial investment of 1/4 of 1% ($250,000), Schneider and/or Schneider Group could invest an additional 4 and 3/4%, for a total of 5%. The letter does not provide for a 5% investment without the "initial investment" of 1/4 of 1%. The phrase "up to 5%" references the amount of the "initial investment", plus any additional investment. (Emphasis added.)
Appellants argue that a separate right to invest, without the initial investment, is also demonstrated because the 5% investment could be made either (1) September 30, 1993; or (2) sixty days from the later of initial investment date. This provision simply allows Schneider to complete his investment on the original initial investment deadline or within sixty days. Alternatively, the "60 days" can be read to qualify "September 30, 1993." Under that interpretation, investment can occur within sixty days of the ultimate initial investment deadline. In this case, the revised initial investment deadline was October 16, 1993, giving Schneider and/or the Schneider Group until December 16, 1993 to invest up to 5% in A-55. Using either interpretation, future investment is conditioned upon completing the $250,000 initial investment.
We find that the letter clearly conditioned any future investment on the $250,000 initial investment. Inland Refuse,15 Ohio St.3d at 322. Even assuming any factual ambiguity in the letter, the trial court's interpretation was within its sound discretion. Id. We agree with appellants that a single document, such as the September 20, 1993 letter, could be divisible to provide two separate offers. See DePugh v. Mead Corp (1992), 79 Ohio App.3d 503,513. However, the letter is not reasonably amenable to appellants' interpretation. In short, Schneider could not invest "up to 5%" without completing the initial investment. Accordingly, the first assignment of error is overruled.
In the second assignment of error, appellants argue that there was no consideration for appellants' waiver of the October 16, 1993 revised deadline, a condition precedent to the initial investment. The trial court found that by accepting the $200,000 check from Evelyn Coffman on October 26, 1993, appellants waived the condition precedent of timeliness. Appellants argue that since the Gilvesy checks bounced, there was no consideration for any extension of the initial investment deadline past October 16, 1993. This argument is without merit. By accepting the $250,000 for the initial investment, appellants waived the condition precedent of timeliness. This waiver of this condition precedent did not require consideration. See Lusher v. Ewing (June 24, 1982), Franklin App. No. 82AP-42, unreported, at 8, citing Andrews v. Watson (1890), 12 Ohio C.D. 692, aff'd. (1894),51 Ohio St. 619. See, also, Corbin on Contracts (One Volume Ed.) (1952), 708-13, Section 753. The second assignment of error is overruled.
In the third assignment of error, appellants allege that in procuring $250,000 for the initial investment, Schneider violated Ohio securities law by acting as a broker without a license. Accordingly, the September 30 agreement, at least in regard to the license, would be against public policy and unenforceable as a matter of law. In addition, appellants asserts that, due to Schneider's actions, he lacked "clean hands" and is precluded from the equitable remedy of specific performance.
Schneider testified that Gilvesy, Secretary of the Schneider Group, gave Gunnerman $10,000 as an earnest money deposit toward the initial investment on October 1, 1993. Gunnerman received four additional checks, in the amounts of $40,000, $50,000 (two checks) and $100,000 in Reno on October 16. Schneider and Gunnerman agreed to extend the September 30, 1993 date for the initial investment until October 16. The $40,000 check was deposited in A-55's account. However, the other checks bounced. Schneider testified that, at the time, he was not aware the checks bounced, but thought Gunnerman never deposited the other Gilvesy checks. In order to complete the initial investment, Schneider called Evelyn Coffman seeking the additional $200,000 to complete the initial investment. Schneider received a check from Evelyn Coffman for $200,000 on October 26, 1993 in Reno and immediately forwarded the check to Gunnerman, who deposited the check in an A-55 bank account. For the investment, the Coffmans received a limited partnership interest in A-55.
Appellants argue that Schneider solicited funds for investment in the Schneider Group and received a personal benefit or commission, the world wide license for use of A-55 fuel technology in aircraft applications. Further, appellants claim Schneider failed to disclose the license to Evelyn Coffman. In essence, appellants insist that Schneider acted as a broker of securities without a license.
R.C. 1707.44(A) provides that:
 No person shall engage in any act or practice that violates division (A), (B), or (C) of section 1707.14 of the Revised Code, and no salesperson shall sell securities in this state without being licensed * * *."
The definition of a "security" is very broad and would include "any investment contract," such as the limited partnership interest in A-55 purchased by the Coffmans. See R.C. 1707.01(B); Mark v. FSC Securities Corp. (C.A. 6, 1989), 870 F.2d 331. However, Schneider's actions did not amount to the sale of securities or violate the requirements of R.C. 1707.14 or1707.44.
Schneider and Evelyn Coffman were both officers of the newly formed Schneider Group. The $200,000 check from Evelyn Coffman served a dual purpose: (1) an investment in A-55 by the Coffmans; and, (2) completion of the initial investment. As we have noted, without completing the initial investment, the September 30 agreement does not allow further investment by Schneider and/or an investment company. Although the license went personally to Schneider, the Schneider Group collectively benefitted because they could not invest "up to 5%" in A-55 without satisfying the condition precedent of the initial investment. Moreover, Schneider testified that he told Evelyn Coffman about the license. Although Evelyn Coffman's testimony differed from Schneider, the trial court was entitled to resolve this factual dispute by concluding there was no failure to disclose. See Ohio Adm. Code 1301:6-3-19(A)(20) (regulation requiring disclosure of "any commission, profit, discount or other remuneration" to the customer).
Similarly, the "clean hands" doctrine does not preclude specific performance. The "clean hands" doctrine would estop a party from seeking equitable relief when that party's prior conduct shows a lack of good faith. Bean v. Bean (1983), 14 Ohio App.3d 358,463-64. In this case, Schneider's actions did not violate Ohio securities law. As noted, there was evidence from which the trial court could have concluded that Schneider informed Evelyn Coffman about the license. The third assignment of error is overruled.
In the fourth assignment of error, appellants argue that specific performance is unavailable because the general rule is a personal services contract cannot be enforced through specific performance. See Goldfarb v. The Robb Report, Inc. (1995),101 Ohio App.3d 134. Appellants' response is that a license for patented intellectual property is always subject to the equitable remedy of specific performance.
The overwhelming authority is that an agreement involving patent rights is subject to specific performance. See, e.g., Aircraft Elec. Appliance Corp. v. Replogle (App. 1933), 15 Ohio Law Abs. 6, 8; H.H. Miller Indus. Co. v. Roman (1930), 37 Ohio App. 71,74. See, also, Hughbanks v. Browning (1917), 9 Ohio App. 114,115-16. Despite this authority, appellants believe that the September 30 agreement is a personal services contract, requiring mutual cooperation and assistance between the parties. Despite any projected business plans between the parties, the September 30 agreement simply calls for the transfer of a world wide license for use of A-55 technology in aircraft applications. This case is not analogous to a franchise agreement requiring continuing cooperation between the parties. See, e.g., Burger King Corp. v. Agad (S.D.Fla. 1995), 911 F. Supp. 1499, 1506. Therefore, the September 30 agreement, as a transfer of patented technology, is subject to specific performance. See Replogle at 8. The fourth assignment of error is overruled.
In the fifth assignment of error, appellants argue that the trial court erred in granting specific performance because Schneider assigned his rights as a licensee to a third party, Aviation Development International ("ADI"). Therefore, appellants claim that the real party in interest is ADI, not Schneider. See Civ.R. 17(A) ("[e]very action shall be prosecuted in the name of the real party in interest").
ADI is owned in part by Schneider and was intended to act as a operating company for the license. According to Schneider, "I would own the license but [ADI] would be the operating company to operate the license was my intention [sic]." Schneider testified that the license was not assigned to ADI or any other entity. The September 30 agreement gives Schneider, not ADI, the license to A-55 technology for aircraft applications. Business and/or investment proposals presented at trial demonstrate a close business relationship between Schneider and ADI and that ADI may benefit financially from the license. However, the September 30 agreement provides the license is exclusively Schneider's property and these rights were never assigned to ADI. Thus, the direct beneficiary and proper party to this action was Schneider. The fifth assignment of error is overruled.
In the sixth assignment of error, appellant argues that the trial court lacked personal jurisdiction over appellants. In order for personal jurisdiction to attach over a nonresident defendant, the defendant must first satisfy Ohio's long arm statute, R.C. 2307.382. Kentucky Oaks Mall v. Mitchell's Formal Wear, Inc. (1990), 53 Ohio St.3d 73, 76. Then, "[t]he question becomes whether the assertion of personal jurisdiction by an Ohio court * * * comports with the Due Process Clause of the Fourteenth Amendment." Id. The settled constitutional standard for personal jurisdiction is whether the nonresident defendant has "certain minimum contacts with [the jurisdiction] such that the maintenance of the suit does not offend `traditional notions of fair play and substantial justice.'" Id., quoting International Shoe Co. v. Washington (1945), 326 U.S. 310, 316, 66 S.Ct. 154,158.
R.C. 2307.382 states in relevant part:
 (A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:
(1) Transacting any business in this state[.]
The phrase, "transacting any business," has been interpreted very broadly. Kentucky Oaks Mall at 75. Gunnerman sent the September 20, 1993 letter to Ohio for Schneider to sign and return. A-55 and Gunnerman intentionally and voluntarily entered into a contract by signing the document and mailing it to Ohio. Id. at 77-78. In mailing the letter to Schneider, appellants entered a business relationship with an Ohio resident. Moreover, Schneider's undisputed testimony is that he intended to develop aircraft applications using the A-55 technology in Fayette County. Accordingly, appellants' contacts with Ohio satisfy the "transacting any business" requirement of R.C. 2307.382(A)(1).
The remaining question is whether appellants' contacts with Ohio satisfy the constitutional standard for personal jurisdiction over appellants. Appellants argue that they did not purposely avail themselves of "the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." Hanson v. Denckla (1958),357 U.S. 235, 253, 78 S.Ct. 1228, 1239-40. We disagree.
Schneider did not initiate contact with A-55 and Gunnerman. The record indicates Schneider was encouraged by Larry Heim to visit Reno, Nevada and consider investing in A-55. Appellants insist that the only proof that Heim was appellants' agent is from Heim. See Ottawa Cty. Commrs. v. Mitchell (1984), 17 Ohio App.3d 208,214 (an agency relationship cannot be proven solely through the testimony of an agent). However, Schneider's testimony provided substantial corroborating evidence that Heim was an agent of A-55. He testified that Heim appeared to be a top person at A-55 and that Heim had an office in Reno. Finally, Gunnerman told Schneider that Heim would become a top manager at A-55.
Significantly, appellants sent the September 20, 1993 letter to Schneider's home in Washington Court House, Ohio. Schneider never indicated he would be moving to Reno, Nevada to work on aircraft applications for A-55 technology. Therefore, appellants could "reasonably anticipate being haled into court" in Ohio. World Wide Volkswagen Corp. v. Woodson (1980), 444 U.S. 286, 297,100 S.Ct. 559, 567. In summary, appellants' contacts meet the International Shoe test and comport with due process. The sixth assignment of error is overruled.
In the seventh assignment of error, appellants argue that the trial court erred in granting judgment against Gunnerman because Gunnerman transferred his world wide rights in the fuel technology to A-55 in a November 2, 1992 "Exclusive License Agreement." Due to this transfer, appellants' position is that Gunnerman was not a necessary party under Civ.R. 19(A).[2]
The November 2, 1992 Exclusive License Agreement transferred A-55 technology rights from Gunnerman to A-55. However, the agreement defined the Licensed Territory as "the United States, Canada and Mexico." A January 3, 1994 Exclusive License Agreement, which replaced the 1992 agreement, used the same definition. Only on March 2, 1995, did A-55 and Gunnerman amend "Licensed Territory" to mean "the world," effective retroactively to January 1, 1995. Therefore, when the agreement between Schneider and appellants was finalized September 30, 1993, Gunnerman had license rights to A-55 outside of North America. Gunnerman cannot avoid contractual liability to Schneider by subsequently assigning all world wide license rights to A-55. Further, the September 30 agreement lists Gunnerman and A-55 as the holders of world wide license rights for A-55 fuel technology. Accordingly, we find that Gunnerman was a necessary party within the meaning of Civ.R. 19(A). The seventh and final assignment of error from the June 19 judgment is overruled.
We now separately address appellants' appeal from the November 25 judgment. The appeal from the November 25 judgment relates solely to whether the trial court went beyond its jurisdiction in attempting to enforce the June 19 judgment. We review the relevant facts, beginning with the June 19 judgment.
The June 19 judgment found that "the agreement entered into between the parties on September 20, 1993, is a binding contract; that the [appellants] are in breach of that agreement; and that [Schneider] has no adequate remedy at law. It is accordingly ordered that the [appellants] perform their obligations under the contract." At that time, appellants did not seek a stay of execution with the trial court.
On July 1, 1997, appellants filed a timely notice of appeal to this court. Also on July 1, 1997, Schneider sent a letter to appellants seeking compliance with the trial court order that appellants "perform their obligations under the contract." On July 23, 1997, appellants responded that Schneider's request was beyond appellants' obligations under the June 19 judgment.
Anticipating enforcement of the judgment, Schneider continued to market aircraft applications for the A-55 technology. On August 18, 1997, Schneider and Island Capital Management Inc., a Grand Cayman, British West Indies Company, reached an agreement involving the license for A-55 technology.
On September 5, 1997, Schneider filed a motion to enforce the judgment. In the motion, Schneider asked the court for $2,000,000 as compensatory damages in lost income due to the delay in enforcing the June 19 judgment. On November 10, 1997, the trial court held a hearing on the motion to enforce. In a November 13 phone conference, the trial court informed the parties that the motion to enforce would be granted. Appellants orally moved for a stay of execution. On November 25, the trial court entered a judgment, which states in pertinent part that:
 The Court has already ordered "that the [appellants] perform their obligations under the contract," and among these obligations is the provision of the A-55 Technology, which the [appellants] defined in "Schedule A".[3]
This definition of the A-55 Technology includes fuel composition. Accordingly, the Court ORDERS that the [appellants] provide [Schneider] with all data as defined in "Schedule A" * * *, including but not limited to the current formula of the A-55 fuel.
The November 25 judgment entry also granted appellants' motion for a stay of execution. Appellants were ordered to execute a supersedeas bond in the amount of $1,000,000. In addition, the trial court ruled that Schneider "has incurred damage in the amount of one million dollars as a direct and proximate result of the failure of the [appellants] to provide [Schneider] with the data as defined in `Schedule A.'" The trial court reasoned that "[t]he documentary evidence and deposition testimony submitted by the [Schneider] in connection with his Motion for Enforcement of the Court's June 19, 1997 Judgment Entry establishes that had the [appellants] provided [Schneider] with the data defined in `Schedule A,' [Schneider] would have received at least one million dollars from Island Capital Management Inc." Finally, the court stated that if the June 19 judgment was affirmed by this court, Schneider was entitled to collect the $1,000,000 judgment from the supersedeas bond.
Appellants filed a timely notice of appeal with this court. Appellants also moved this court to eliminate the supersedeas bond as a condition of the stay. This motion was denied in a January 16, 1998 entry. From the November 25 judgment, appellants present four assignments of error:
Assignment of Error No. 1:
 The Trial Court's Judgment Granting Plaintiff's Motion for Enforcement is Void Because the Court Exceeded Its Jurisdiction.
Assignment of Error No. 2:
 The Trial Court Erred to the Prejudice of Defendants in Granting Plaintiff's Motion for Enforcement Because Civil Rule 70, by Its Own Terms, Was Not Applicable.
Assignment of Error No. 3:
 The Trial Court Erred to the Prejudice of Defendants in Granting Plaintiff's Motion for Enforcement Because as Opposed to Monetary Damages, Plaintiff Had Already Elected the Equitable Remedy of Specific Performance.
Assignment of Error No. 4:
 Judicial Construction Is Impermissible When the Judgment is Unambiguous.
In the first and second assignments of error, appellants argue that the trial court did not enforce the June 19 judgment, but modified the judgment while an appeal was pending with this court. Moreover, appellants insist that Civ.R. 70, which allows the trial court to enforce a judgment of specific performance, was misapplied.
The general rule is upon filing a notice of appeal, "the trial court retains jurisdiction not inconsistent with the reviewing court's jurisdiction to review, modify or affirm the judgment." Pegan v. Crawmer (1996), 76 Ohio St.3d 97, 102-03, citing State ex rel. Neff v. Corrigan (1996), 75 Ohio St.3d 12, 15. A judgment entered by a trial court without subject matter jurisdiction is void ab initio. Hoerner v. Downs (1989), 63 Ohio App.3d 286, 288. A settled exception is the trial court retains the right to enforce its own orders. Coyne v. Bureau of Motor Vehicles (July 16, 1984), CA83-09-075, unreported, at 3. When a plaintiff seeks enforcement of a judgment of specific performance, a procedural device available is Civ.R. 70. The rule states in part that:
 If a judgment directs a party to execute a conveyance of land, to transfer the title or possession of personal property, to deliver deeds or other documents, or to perform any other specific act, and the party fails to comply within the time specified, the court may, where necessary direct the act to be done at the cost of the disobedient party * * *. The court may also in proper cases adjudge the party in contempt. (Emphasis added.)
Appellants contend that the November 25 judgment modifies the June 19 judgment by: (1) requiring appellants to provide Schneider with the formula for the A-55 fuel and other data, and (2) awarding Schneider $1,000,000 in compensatory damages. We first address the issue of specific performance pursuant to Civ.R. 70.
In regard to the formula for the A-55 fuel, appellants contend that "perform[ing] their obligations under the contract" does not include providing the A-55 fuel formula to Schneider. Instead, appellants' view is that Schneider is only entitled to use A-55 formula for aircraft applications. Appellants contend that ordering appellants to provide the A-55 fuel formula effectively gives Schneider ownership, rather than a license in the A-55 fuel technology. By transferring ownership, appellants insist the trial court modified the June 19 judgment.
Appellants' argument is not well-taken. We agree with the trial court's conclusion that "[w]ithout the A-55 technology, [Schneider] cannot develop aircraft applications as contemplated under the September 20, 1993 agreement." The trial court elaborated that "[b]ecause the composition of the fuel is included in `Schedule A' as part of its definition of the A-55 fuel technology," appellants must provide the data in Schedule A. In providing this information, appellants are not providing ownership rights to A-55 technology. Schneider has a world wide license to utilize A-55 fuel technology for aircraft applications only.
By ordering appellants to provide the A-55 formula, the trial court did not modify the June 19 judgment. The trial court enforced the obligations inherent in appellants' legal obligation to "perform their obligations under the contract." We also reject the assertion that Civ.R. 70 is inapplicable because the June 19 judgment failed to provide a "time specified." Absent a specific date of performance, appellants were obligated to perform their contractual obligations within a reasonable time. This obligation derives from a trial court's inherent right to enforce its own orders. Coyne at 3. See, also, Standard Oil Co. v. Vales (Apr. 26, 1979), Cuyahoga App. Nos. 38972 and 38344, unreported.
Appellants also argue that the trial court erred by (1) ordering a $1,000,000 supersedeas bond as a condition of stay, and (2) ruling that Schneider "has incurred damage in the amount of one million dollars as a direct and proximate result of the failure of the [appellants] to provide [Schneider] with the data as defined in `Schedule A.'" In our ruling on or about January 15, 1998, we ruled the trial court acted within its discretion in ordering a $1,000,000 supersedeas bond as a condition of the stay. The trial court has complied with the supersedeas bond statute.
A separate issue is whether the trial court acted properly in awarding a $1,000,000 money judgment to Schneider. Appellants claim this order modifies the June 19 judgment by providing compensatory damages. Appellants misconstrue the nature of the judgment. The damages award is not based on the evidence presented at trial and does not expand the June 19 judgment. Instead, the $1,000,000 award represents compensatory damages which accrued when appellants failed to provide the A-55 formula upon Schneider's written request. As explained, the trial court has an inherent right to enforce its own judgment. Coyne at 3.
Nevertheless, after a careful review of the documentary evidence and deposition testimony, we cannot establish the specific basis for the trial court's calculation of a $1,000,000 damage award. Moreover, it is far from clear that appellants had the opportunity to present evidence on this issue. Therefore, we remand this case to the trial court to conduct an evidentiary hearing to determine the issue of damages from appellants' failure to promptly comply with the June 19 judgment. Therefore, on the sole issue of the calculation of damages, the first and second assignments of error are sustained. All other issues raised in the first and second assignments of error are overruled.
In the third assignment of error, appellants argue that, by electing the equitable remedy of specific performance, Schneider was barred from seeking monetary damages. See, generally, Corbin on Contracts (1964), 475-477, Section 1222. However, Schneider was not seeking a new remedy under the June 19 judgment. Instead, Schneider was pursuing compensatory damages caused by appellants' failure to comply with the mandate of the June 19 judgment. Although we are remanding for a precise calculation of damages, there is no question that the trial court was within its jurisdiction to enforce that mandate. Coyne at 3. Accordingly, the third assignment of error is overruled.
In the fourth assignment of error, appellants claim that the trial court erred by interpreting a judgment that was unambiguous as a matter of law. Appellants' position is that the June 19 judgment does not entitle Schneider to the A-55 fuel formula. The disposition of the prior assignments of error forecloses this argument. We have found that appellants' "obligations under the contract" include providing the formula for the A-55 fuel technology and other data, as outlined in Appendix A. The fourth assignment of error from the November 25 judgment is overruled.
In summary, the June 19 judgment requiring appellants to perform their "obligations under the contract" is affirmed. Also, the November 25 judgment, providing that appellants provide the formula for the A-55 fuel technology and other data in Appendix A is affirmed. We further find that the trial court had jurisdiction to award damages for appellants' failure to comply with the June 19 judgment. However, upon remand, the trial court shall conduct an evidentiary hearing to determine the issue of damages caused by appellants' delay in complying with the June 19 judgment.
Judgments affirmed in part, reversed in part, and remanded for proceedings not inconsistent with this opinion.
YOUNG, P.J., and POWELL, J., concur.
[1] A-55 fuel technology is an aqueous fuel with fifty-five percent water. The technology apparently has advantages over standard fuels in the operation of internal combustion engines.
[2] Civ.R. 19(A) provides that "[a] person who is subject to service of process shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties * * *[.]"
[3] Schedule A is an appendix to the Limited Partnership Agreement of A-55 and describes the A-55 fuel technology.